## IN THE UNITED STATES DISTRICT COURT
District of Western Washington at Tacoma

### CASE No. 3:20-cv-05389-BHS-DWC

Martin Stanley Ivie,
Plaintiff

v.

Travis Adams, Detective Arnold, J. Bjorgen, Sgt. Brady, Dusty Breen, Peter Camiel, Sgt. Clark, Michael Dorcy, Investigator Doughty, Lt. Elwin, Amber Finley, James Foley, Det. J. Gardner, Det. Gray, Marty Hayes, Michael Johnston, Charles Lane, Capt. Eric Mainio, C.J. Maxa, Det. McGowan, William Reed, Det. J. Rhoades, Casey Salisbury, Dep. M. Sargent, Det. Cameron Simper, John Snaza, Bill Tuffrees, Jon Tunheim, Timothy Whitehead, Sgt. Wilkinson, J. Worswick;

Defendants,
each in their complete personal and professional capacities


### CLAIM FOR RELIEF FROM DAMAGES CAUSED BY TORTS
[US Constitution, Amendments V & VIII; 18 USCS §§§ 3, 4, 1515]

### TABLE OF CONTENTS

1. Introduction & Disclaimer

2. Torts (Grounds for Claims)

3. Damages (Grounds for Relief)

4. Relief

5. Summary

Exhibits:

A. Sworn Witness Testimony of Intent to Kill Plaintiff (3.21.20)
B. Habeas Corpus Filing with Proofs of Attempt to Kill & Cover-Up (1.13.20)
C. Defendant Roster including Addresses


DATE: 24 April 2020

## 1. Introduction & Disclaimer

Comes Now Plaintiff, Martin Stanley Ivie, claiming damages and seeking relief vie this federal Court from severe torts involving criminal acts of Constitutional and National importance.

This duly-filed claim contains independent, professional and sworn proofs that, collectively in differing individual capacities, (a) tried to murder the Plaintiff on the night of 2.9.2012 in direct breach of the 5th Amendment securities from arbitrary deprivation of Life, Liberty and Property, (b) inflicted great bodily harm to him using a State-issued machine gun while he was unarmed and violating no laws in his own private community, and (c) are still executing a fraudulent Stalking-Horse cover-up of their malice, primarily by means of a wrongful imprisonment (i.e. usurpation of Courts of Law) for made-up crimes that never happened.

Collectively, each and all of the defendants continue to brazenly breach 18 USCS §§§ 3, 4 & 1515 (Accomplicement, Misprision and Obstruction), from which NO ONE has immunity.

"WHOEVER, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an Accessory-After-The-Fact." - 18 USCS §3

"WHOEVER,, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title, or imprisoned ... or both." - 18 USCS §4

1.a DISCLAIMER

This is NOT a 42 USC §1983 Claim, and there are NO indemnities from the Torts described, or their consequences.

This is NOT a Writ of Habeas Corpus - although criminal deprivation of liberty, as plainly articulated and proven in Exhibit B, verifies the scope of total claims herein, lawful restroration of Liberty is NOT a relief sought by this action.

Any misguided, banal or insolent inference that this suit is either of these other legal actions as an attempt to ignore or dismiss it will be considered supplemental Obstruction of Justice, violative of 18 USCS §1515 (a)(3)(A,B,C,D,E) - "Misleading Conduct".

## 2. TORTS - Grounds for Claims

Exhibit A affirms the debauchery and malicious intent of sworn law enforcement officials in Mason County, Washington.  Exhibit B proves (a) the execution of these nefarious plans, and (b) the ensuing cover-up by means of gross fabrication and tampering of evidence, and usurpation of Courts of Law in order to propagate the outrageous and illegal Stalking Horse diversion that the Plaintiff committed crimes on the night of 2.9.2012.

The Grounds claimed herein ere exceedingly axiomatic based upon the incontrovertible facts in the Exhibits.

A Duly-Ordered Trial by this Court can only serve to shock the American public with disturbing proof of unfathomable police brutality and systemic judicial corruption, all at remarkable expense to taxpayers.

## 3. DAMAGES - Grounds for Relief

For criminal acts of hostility against the Plaintiff that cumulate as terrific violation of the "Cruel & Unusual" Clause of Amendment VIII of the US Constitution, Plaintiff herein claims pecuniary relief described in Part 4 next.

## 4. RELIEF

While some defendants were clearly perpetrators and yet others only accessories-after-the-fact of the "Ambush and Attempt to Destroy" the Plaintiff, the collective roster of Defendants are hereby sued for pecuniary relief, due to loss of income from business operations, permanent physical injury (lodged bullets), and intense psychological adversity, in the amount of:

$288,408,800.00 USD
Two Hundred and Eighty-Eight Million,
Four Hundred and Eight Thousand, and
Eight Hundred
United States Dollars.

## 5. SUMMARY

Exhibit C contains the currently full roster of Defendants with concise itemization of their roles in the attempt to kill the Plaintiff and cover up that criminal action. By direct violation of 18 USCS §§ 3 & 4 in the subsequent and continuing attempt to ruin the life of the Plaintiff, each defendant is accruing compounding liabilities that have no expiration or statute of limitations.

On Public Record, this tribunal is hereby put on formal notice that reprisal by obviously demented Mason & Thurston County government agents is expected.

But "Cruel & Unusual" malice is still illegal.

Court should promptly Order a long-awaited Day of Lawful Reckoning for dangerous lawbreakers who systematically violate the trust of the American public and their sworn fidelity to US Law and Order.

Respectfully and Earnestly submitted under penalty of perjury of the Laws of the United States of America on this 24th Day of April, 2020 by:

Ivie v. Adams, et. al.                                    page 2 of 3

Martin Stanley Ivie
#307402
191 Constaintine Way
Aberdeen, WA 98520

cc: FILE
    CIA
    FBI
    World Court @ The Hague (1948 UDHR Violations)

Ivie v. Adams, et. al.                                    page 3 of 3

EXHIBIT A

Sworn Witness Testimony of Intent to Kill Plaintiff

2 pages

3.21.20

Statement of Gilbert Michael Greenwood

I met William (Bill) Reed, a Mason County Deputy Sheriff, in the early 2000's from an ongoing investigation over the theft of my portable sawmill from my lot on Dow Mountain. Deputy Reed said he had a suspect in mind, and at a later time told me his name was Martin Ivie, who also lived on Dow Mountain.

Many years transpired and I encountered Deputy Reed on numerous occasions when working on equipment for Lake Cushman Maintenance Company. I considered him somewhat of a casual acquaintance over time. Most of our conversations were just small talk, but at some point would touch upon the unsolved theft of my sawmill. Then Deputy Reed would talk about Mr. Ivie, verbalizing they (Sheriffs Department) had no evidence against him yet; suspected him of stealing Maple Trees; of burglaries and thefts; and of selling illegal drugs. He said something along the line that Mr. Ivie was very sneaky and kept getting away. Deputy Reed said "I'm going to put him down one day." The obdurate manner in which he spoke had such hardness, it caused me to look at him, curious to his demeanor? His look was interrogative as if gauging my reaction. My curiosity piqued I replied "Some people just waste air". He said "We'll get him." I felt uncomfortable. I did not feel Deputy Reed meant-to arrest him. It was obvious Deputy Reed had developed a severe loathing for Mr. Ivie over the coarse of their previous history. I recall privately thinking "I sure would not want to be Mr. Ivie when they caught up to him."

In mid 2012 I had an encounter with Deputy Reed. After greetings I asked if there had been any update on my stolen sawmill?

Page 1 of 2

Statement of Gilbert Michael Greenwood

He replied "no, but we finally put him down." He also said something to the effect of "we shot him" or "he was shot" many times. When I asked if he was killed, deputy Reed disappointedly replied "no, he wouldn't die, we had to give aid." "But we put him away a long time. He's no longer a problem." When I asked what happened, his demeanor suddenly cooled. He replied "We caught him stealing Maple." He did not elaborate, nor did I press him for more information. He changed the subject by telling me about a truck he stopped towing a sawmill like the one stolen from me. Deputy Reed said he thought he had recovered my sawmill, but the serial number did not match.

I have no other knowledge of the Martin Ivie incident. I make this statement of my own free will under no duress.

Gilbert Michael Greenwood

March 21, 2020

– End of Statement –

Page 2 of 2

EXHIBIT B

Habeas Corpus with Proofs of Attempt to Kill & Cover-Up

1.13.20

111 pages

**Andersen, Lucy C. (DOC)**

| | |
|---|---|
| **From:** | ECF@wawd.uscourts.gov |
| **Sent:** | Tuesday, January 14, 2020 12:15 PM |
| **To:** | ECF@wawd.uscourts.gov |
| **Subject:** | Activity in Case 3:20-cv-05027-RJB-DWC Ivie v. Haynes Proposed Document(s) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**United States District Court for the Western District of Washington**

**Notice of Electronic Filing**

The following transaction was entered on 1/14/2020 at 12:15 PM PST and filed on 1/13/2020

| | |
|---|---|
| **Case Name:** | Ivie v. Haynes |
| **Case Number:** | 3:20-cv-05027-RJB-DWC |
| **Filer:** | Martin Stanley Ivie |
| **Document Number:** 1 | |

**Docket Text:**
**PROPOSED 2254 Writ of Habeas Corpus, filed by Petitioner Martin Stanley Ivie. (NO FILING FEE/NO IFP) (Attachments: # (1) Transmittal Email, # (2) Filing Fee Transfer Request) \*\*109 PAGE(S), PRINT NEF ONLY\*\* (Martin Ivie, Prisoner ID: 307402) (ERA)**

**3:20-cv-05027-RJB-DWC Notice has been electronically mailed to:**

Martin Stanley Ivie   docscccinmatefederal@DOC1.WA.GOV

**3:20-cv-05027-RJB-DWC Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1035929271 [Date=1/14/2020] [FileNumber=7894364-0
] [b2dad8d6d1c4c35cabfb4222d8f5ce2f1ba2aa327582e588a658c2f0ecc22d5fe88
7356a637d1bebe31f334e0670f44a3d45b49a4c3bab597cb3b9f1ba0adadc]]

# LEGAL COPY/INDIGENT POSTAGE/SCANNING REQUEST

**Department of Corrections**
WASHINGTON STATE

Only one document per request.

X **Martin S. Ivic**        **307402**        **H-3 B54**        **1-13-20**
Requestor full name                DOC number        Unit/cell        Date

Requestors must allow 7 business days to schedule the request in advance of any known deadlines.
Debt incurred for copies or indigent postage will be recovered per DOC 200.000 Trust Accounts for Offenders.

## PHOTOCOPY REQUEST

**Blank pages will not be copied • All Copies will be mailed out immediately**

Legal pleadings and exhibits being submitted to the court and opposing party in a case regarding one of the following (select one).  ☐ Current conviction      ☐ Conditions of confinement      ☐ Challenge to sentence

Case number: _____    Verifiable Deadline _____

Copies need to be mailed to:
- ☐ Court: _____
- ☐ Counsel listed on the Judgement & Sentence (J & S) for appeals: _____
- ☐ Opposing party(ies): _____

Other:  ☐ Ombuds - Up to 20 pages not related to grievance documents

Other legal photocopies, which require available funds (select one of the following and identify):
- ☐ Working legal documents/letters to legal entities for active cases: _____
- ☐ Letters to legal entities per DOC 450.100 Mail for Prison Offenders: _____
- ☐ Legal documents/papers or materials (e.g., divorce decree/child custody petition, legal name change/tort claim documents): _____

Number of pages: _____ x Number of copies: _____ = Total pages: _____ x $0.20 = Total cost: $_____

-------------------------------------------- Employee use only --------------------------------------------

☐ Requestor is on indigent list                    ☐ Copies are eligible to create debt

Requestor has:   ☐ Insufficient funds        ☐ Attached DOC 06-075 Request to Transfer Funds
                 ☐ Sufficient funds          ☐ Attached DOC 02-003 Postage Transfer

Copies made by: _____    Date copies made and sent out: _____

## INDIGENT POSTAGE REQUEST

This applies to postage needed by a requestor on the indigent list for one of the following (select one):
- ☐ BAR Association for attorney complaints        ☐ Department Ombuds
- ☐ Indeterminate Sentence Review Board            ☐ Prison Rape Elimination Act (PREA) Coordinator
- ☐ Department of Enterprise Services/Office of Financial Management for tort claims
- ☐ Court or opposing attorney/party (only in cases related to the offender's terms of confinement or conditions of sentencing)

## SCANNING REQUEST

Scanning is only applicable for courts requiring electronic filing per participation with the Department in an electronic filing program. Scanning will not incur a fee.

X Court: **USDC W.Wa. Thoma** Case number: **New**    Number of pages: **109**
Scanning completed by: **Lucy Anderson CU** Date scanned: **1/13/2020**   Page count: **100 + 9**

## WAIVER OF PRESENCE

By signing, requestor waives right to be present when copying/scanning is conducted:

Requestor signature: _____    Date: _____

The contents of this document may be eligible for public disclosure. Social Security Numbers are considered confidential information and will be redacted in the event of such a request. This form is governed by Executive Order 00-03, RCW 42.56, and RCW 40.14.

Distribution:  **ORIGINAL** - Law Librarian/designee

13 January 2020


Clerk of the Court
United States District Court
District of Western Washington
1717 Pacific Ave.
Tacoma, WA  98402

TRANSMITTED VIA E-FILE

SUBJECT:  Habeas Corpus of Martin S. Ivie

Dear Clerk of the Court:

Please find following a duly-filed Petition for Writ of Habeas Corpus in
full compliance with 28 USCS §2254.  Included in this transmittal that
is secured under General Order 02-15 are the following 109 total pages:

This Cover Letter ... 1 page
Copy of Money Transfer for $5 fee ... 1 page
'Boilerplate' 2254 Formwork ... 15 pages
Petition with Exhibits ... 92 pages

Total of 109 pages

Thank you in advance for your diligence in Due Process filing of this
duly-filed claim for deliverance from criminally-illegal incarceration.

Sincerely,

Martin S. Ivie

cc:  FBI



**REQUEST TO TRANSFER FUNDS**
*PETICION PARA LA TRANSFERENCIA DE FONDOS*

Department of
**Corrections**
WASHINGTON STATE

| PLEASE PRINT/*FAVOR DE USAR LETRA DE MOLDE* | |
|---|---|
| Name/*Nombre* Martin Stanley Ivie | DOC Number/*Número DOC* 307402 |

Please deduct sufficient funds from my account to cover the cost of: / *Favor de restar los fondos suficientes de mi cuenta para cubrir el costo de:*
$2254 Habeas Corpus
☐ Use medical subaccount (eyeglass purchases only)
☐ *Use subcuenta médica (sólo compra de anteojos)*

| Facility/*Instalación* SCCC | Date/*Fecha* 1.13.20 |
|---|---|
| Pay To/*Pagadero a* United States District Court | Pay Amount/*Monto a pagar* $5.00 |

Address/*Dirección* Street/*Calle* 1717 Pacific Ave., City/*Ciudad* Tacoma, State/*Estado* WA Zip/*Código postal* 98402

| Purpose/*Propósito* Federal Filing Fee | Housing Unit/*Unidad de vivienda* H3B - 54L |
|---|---|
| Signature/*Firma* X Martin Ivie | Counselor/*Consejero/Consejera* MCGRATH |
| Counselor's Signature/*Firma del consejero* X B Washif | Date/*Fecha* 1.13.20 |

| ACCOUNTING DEPARTMENT – *DEPARTAMENTO DE CONTABILIDAD* | |
|---|---|
| Comments/*Comentarios* | |
| Check Number/*Número de cheque* | Date Processed/*Fecha procesado* |

**PLEASE ATTACH A SELF-ADDRESSED ENVELOPE** / *FAVOR DE ADJUNTAR UN SOBRE CON SU NOMBRE Y DIRECCION*

Distribution:  **WHITE** - Accounting   **YELLOW** - Counselor   **PINK** - Offender
DOC 06-075ES (Rev. 7/19/18)   DOC 200.000, DOC 210.060, DOC 380.605, DOC 440.000, DOC 540.105, DOC 590.500

AO 241
(Rev. 01/15)

Page **1**

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court Western | District: WASHINGTON |
|---|---|

| Name (under which you were convicted): Martin Stanley Ivie | Docket or Case No.: |
|---|---|

| Place of Confinement : Stafford Creek @ Aberdeen | Prisoner No.: 307402 |
|---|---|

| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| Martin Stanley Ivie | v. Ronald Haynes, SCCC |

| The Attorney General of the State of: Washington |
|---|

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   Mason County Superior Court

   Shelton Washington

   (b) Criminal docket or case number (if you know): 12-1-64-6

2. (a) Date of the judgment of conviction (if you know): 11.3.15 (amended)

   (b) Date of sentencing: 11.3.15

3. Length of sentence: 213 months

4. In this case, were you convicted on more than one count or of more than one crime? ☒ Yes  ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case:

   Count 2 — eluding a police vehicle
   Count 3 — 1st° Assault
   Count 5 — 3rd° Assault
   Count 6 — 1st° Assault

6. (a) What was your plea? (Check one)

   ☒ (1)  Not guilty          ☐ (3)  Nolo contendere (no contest)

   ☐ (2)  Guilty              ☐ (4)  Insanity plea

AO 241
(Rev. 01/15)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did
you plead guilty to and what did you plead not guilty to?

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

[X] Jury    [ ] Judge only

7.   Did you testify at a pretrial hearing, trial, or a post-trial hearing?

[X] Yes    [ ] No

8.   Did you appeal from the judgment of conviction?

[X] Yes    [ ] No

9.   If you did appeal, answer the following:

(a) Name of court: Wa. CoA-II

(b) Docket or case number (if you know): 44258-2-II

(c) Result: convictions affirmed; remanded for resentencing

(d) Date of result (if you know): 4.22.15

(e) Citation to the case (if you know): _____

(f) Grounds raised:
1. insufficient evidence
2. improper admission of post-arrest statement
3. error in finding post-arrest statement voluntary
4. failure in jury instructions
5. denial of motion for new trial for juror misconduct
6. failure to prove prior conviction for sentencing
7. ineffective counsel

(g) Did you seek further review by a higher state court? [X] Yes   [ ] No

If yes, answer the following:

(1) Name of court: Wa. St. Supreme Court

(2) Docket or case number (if you know): _____

(3) Result: Review Denied

_____

(4) Date of result (if you know): _____

AO 241
(Rev. 01/15)

(5) Citation to the case (if you know): _____

(6) Grounds raised: *Same as in CoA-II*

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?  ☐ Yes  ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?  ☒ Yes  ☐ No

11.  If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court: *CoA - II*

(2) Docket or case number (if you know): *49526-1-II*

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: *Personal Restraint Petition*

(5) Grounds raised: *ineffective assistance of counsel, including failure to call expert forensic witness and suppression of exculpatory evidence, failure to call a material witness to impeach a key state witness on issue of bias and perjury by state witness, failure to call key expert witnesses and prepare petitioner to testify. Failure to address exculpatory facts.*
*Prosecutor misconduct*

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
☒ Yes  ☐ No

(7) Result: *hearing only on failure to call material witness/PRP Denied*

(8) Date of result (if you know): *1.23.19*

AO 241
(Rev. 01/15)

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: Wa. St. Supreme Court

(2) Docket or case number (if you know): 96860-8

(3) Date of filing (if you know): 2.23.19

(4) Nature of the proceeding: Motion: Grounds for Direct Review

(5) Grounds raised: Perjury, Fraud, Accomplicement to and Misprision of felony by State Officers, fabrication of evidence, malicious prosecution

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes  ☒ No

(7) Result: DENIED

(8) Date of result (if you know): 8.6.19  &  11.6.19

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

AO 241
(Rev. 01/15)

Page 5

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:   ☒ Yes   ☐ No

(2) Second petition:   ☒ Yes   ☐ No

(3) Third petition:   ☐ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. (Supplemental Petition & Exhibits Attached)

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** Perjury

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

State's witnesses unanimously lied under oath regarding police-fabricated tales that diametrically oppose reality and truth in expert unbiased forensic evidence and actual police records.

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

_____

AO 241
(Rev. 01/15)

Page 6

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Grounds for Direct Review

Name and location of the court where the motion or petition was filed:   Wa St. Supreme Court

Docket or case number (if you know):   96860-8

Date of the court's decision:   8.6.19  &  11.6.19

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?   ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   Wa St. Supr. Ct.

_____

Docket or case number (if you know):   96860-8

Date of the court's decision:   11.6.19

Result (attach a copy of the court's opinion or order, if available):   Denied w/o Reason

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

AO 241
(Rev. 01/15)

Page 7

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

**GROUND TWO:** Suppression of Exculpatory Evidence

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Actual ballistic proof completely dispels State's fables.

State's witnesses, including police officers, incontrovertibly lied under oath to reconstruct a myth in order to conceal their illegal actions.

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

**(c)   Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☐ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

**(d)   Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Grounds for Direct Review

Name and location of the court where the motion or petition was filed: Wa. St. Supreme Court

Docket or case number (if you know): 96860-8

Date of the court's decision: 8.6.19  &  11.6.19

AO 241
(Rev. 01/15)

Page 8

Result (attach a copy of the court's opinion or order, if available): _attached_

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☒ No

(4) Did you appeal from the denial of your motion or petition?  ☐ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☐ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _WSC / Denied #96860.8_
_WC of Appeals Div II_

Docket or case number (if you know): _44258-2-11_

Date of the court's decision: _8-6-19_ & _11.6.19_

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : _____

**GROUND THREE:** _Ineffective Counsel in irrefutable collusion with State's malicious acts_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
_Counsel to-date has nefariously refused to challenge State's deception with incontrovertible facts._

AO 241
(Rev. 01/15)

Page 9

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

_____

(c)   **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Grounds for Direct Review

Name and location of the court where the motion or petition was filed:   Wa. St. Supreme Court

Docket or case number (if you know):   96860-8

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?   ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   Wa St. Sup. Ct.

Docket or case number (if you know):   96860-8

Date of the court's decision:   11.6.19

Result (attach a copy of the court's opinion or order, if available):

Denied w/o Reason

_____

_____

AO 241
(Rev. 01/15)

Page **1** 17

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

**GROUND FOUR:**  ineffective counsel for refusing to shed light
on State's history of harassment and false arrest of Petitioner

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Officers Raed & Adams have an extensive,
highly documented history of abusive harassment
of Petitioner.
In irrefutable fact, Petitioner was stalked
ambushed and shot in the back by machine
gun in the confines of his gated community,
without cause.

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)   **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Grounds for Direct Review

AO 241
(Rev. 01/15)

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____ 96860-8 _____

Date of the court's decision: _____ 8.6.19 _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?              ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?         ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Wa. St. Sup Ct.

Docket or case number (if you know): _____ 96860-8 _____

Date of the court's decision: _____ 11.6.19 _____

Result (attach a copy of the court's opinion or order, if available):

Denied w/o Reason

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

_____

_____

(e)    Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

•  Writ of Mandamus for Production of Evidence

•  RCW 42.56 Public Records Act Disclosures

_____

_____

_____

AO 241
(Rev. 01/15)

Page 12

13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court

        having jurisdiction?  ☒ Yes        ☐ No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

        presenting them: _____

        _____

        _____

        _____

(b)     Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

        ground or grounds have not been presented, and state your reasons for not presenting them:

        No._____

        _____

        _____

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

        that you challenge in this petition?        ☒ Yes        ☐ No

        If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

        raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

        of any court opinion or order, if available.   USDC of W.Wa @ Tacoma

        CASE NO. 3:19-cv-05782 (8.23.19)

        On 1.7.20, this court dismissed this cause WITHOUT

        prejudice "for failure to comply with a Court Order"

        that WAS NEVER DELIVERED to the Petitioner

        in order for him to Comply with it. This failure

        to deliver is a violation of General Order #02-15

        (extended) by SCCC staff. Hence this timely re-filing by Petitioner.

15.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

        the judgment you are challenging?        ☐ Yes        ☒ No

        If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

        raised. _____

        _____

        _____

        _____

        _____

        _____

AO 241
(Rev. 01/15)

Page 13

16.  Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: James P. Foley
1628 Hays Ave. NW, Olympia, WA 98502

(b) At arraignment and plea: J. P. Foley

(c) At trial: J. P. Foley

(d) At sentencing: Charles Lane
18000 Cooper Point Rd. SW #3, Olympia, WA 98502

(e) On appeal: Victoria Lyons
1511 3rd Ave, Ste 701, Seattle, WA 98101

(f) In any post-conviction proceeding: Peter Camiel & Catherine Chaney
520 Pike St., Ste. 2500, Seattle, WA 98101

(g) On appeal from any ruling against you in a post-conviction proceeding:
Camiel & Chaney

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   ☐ Yes   ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?   ☐ Yes   ☐ No

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

This 2254 has been filed within the 1 year allowance.

AO 241
(Rev. 01/15)

NOTICE: Pursuant to 28 USCS §2254, following page 15 is a succinct "PETITION FOR WRIT OF HABEAS CORPUS" including Authorities Cited, Questions of Law Invoking Writ, and Grounds for Dismissal, along with a cogent Appendix of Exhibits proving the criminal malice of State officials in the underlying case.

( 92 total pages in attached petition with Exhibits)

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)   A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241
(Rev. 01/15)



(2)    The time during which a properly filed application for State post-conviction or other collateral review with
respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation
under this subsection.

Therefore, petitioner asks that the Court grant the following relief: At least reverse and remand
for New Trial in unbiased court based on only
valid evidence, if not outright and total dismissal.

or any other relief to which petitioner may be entitled.

_____
n/a
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on   1.13.20   (month, date, year).

via E-Filing Protocol from SCCC

Executed (signed) on   1.13.20   (date).

_____
X  [signature]
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____
_____
_____
_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF WESTERN WASHINGTON AT TACOMA

in re: Mason County No. 12-1-64-6, and
Court of Appeals No. 49526-1-II, and
State of Washington Supreme Court No. 96860-6

Martin S. Ivie, Petitioner
v.
Ronald Haynes, Defendant

PETITION FOR WRIT OF HABEAS CORPUS

Comes Now Petitioner, in Good Faith, timely and appropriately filing
this Petition for Writ of Habeas Corpus pursuant to 28 USCS #2254 that
is invoked, at least, to stop fraudulent imprisonment that is also
herein proven to be criminally malicious in nature.

The Court should note that Plaintiff has exhausted all State remedies
for correcting these unjust breaches of Constitutional Law (via the
Cause Numbers first listed in the heading above, where the applicable
Lower Court Rulings are herein included as Exhibit F).

TABLE OF CONTENTS

i. Authorities Cited

I. Questions of Law
II. Introduction
III. Grounds for Dismissal
IV. Conclusion

ii. Appendix of Exhibits:
        a. Radio Log
        b. Crimes Scene Maps with Declaration
            ONE - Overview
            TWO - Tree Scene
            THREE - Shooting Scene
        c. Expert Ballistic Analysis
        d. Notice of Court Misconduct with Juror
        e. Petitioner's Valid Forest Products Harvesting Permit
        f. Relevant Lower Court Rulings

## i. AUTHORITIES CITED

### CASES

Costanich v. DSHS, 627 F.3d 1101, 1111 (9th Cir. 2010)

Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001)

Gantt v. City of LA, 717 F.3d 702, 707 (9th Cir. 2013)

Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013)

Halsey v. Pfeiffer, 750 F.3d 273, 232-3 (3d Cir. 2014)

Miller v. Pate, 386 US 1, 87 S.Ct. 785, 17.L.Ed.2d 690 (1967)

US v. Throckmorton, 98 US 61, 25 L.Ed.93 (1878)


### RULES

18 USCS §3
18 USCS §4
18 USCS §§§§1962-1965

US Constitution, Amendments IV, VIII, XIV

I. <u>QUESTIONS OF LAW</u>

1. Is it legally permissible for State officials to use spurious evidence that
is proven unanimously by professional forensic analysis to be forged in order
to 'create conviction' of a US Citizen?

2. Is it legally permissible for State officials to conceal abusive police
actions by charging and convicting a US Citizen for crimes proven to have not
happened?

3. Is it legally permissible for State officials to commit perjury that
diametrically opposes police radio call log and Professional Ballistic
Forensic records that were openly tampered with in order to falsely frame a US
Citizen?

4.  Is it legally permissible for State officials to commit perjury by lying
under oath and concealing proof of that fraud by withholding exculpatory
police records and purposefully introducing perjured witness testimony?

5.  Is it legally permissible for police officers to harbor personal grudges
throughout a multi-year, documented history of abusive and embarrassing false
arrests, and act out upon that frustration by ambushing an unarmed US Citizen
in his own private gated community, who is committing no crime, and shooting
him and his dog in the back with an automatic assault rifle?

## II.  INTRODUCTION

Plaintiff is currently serving a 222 month sentence for assault.

The foundation of this filing is built on the incontrovertible fact that State forged and falsified evidence in order to manufacture a wrongful conviction. Worse still, overwhelming preponderance of evidence again proves that this fraud was crafted in order to conceal the alarming criminal abuses executed by State officials.

Police fabrication of preposterous Assault charges as a Stalking Horse diversion from the truth of their vicious machine-gun ambush on an unarmed man and his dog is appalling.

Primal to this Cause, State's crimes are also compounding.  There is no statute of limitations on fraud, and just the uppermost of the alarming perjuries by Defendant verified in this document are more than sufficient to overturn the entire scandalous case against Plaintiff.  Multiple counts of material perjury are presented as Cause of injunction: Court need only pick one.

Relative to restoration of the Plaintiff's Liberty, res judicata:

In 'Miller v. Pate', 386 US 1, 87 S.Ct. 785, 17.L.Ed.2d 690 (1967), the Supreme Court held that "the Due Process Clause was violated by the prosecution's summation expressly relying on evidence he introduced that he knew to be false".  In condemning this behavior, the Supreme Court observed that, "more than 30 years ago, this Court held that the Fourteenth Amendment cannot tolerate a State criminal conviction obtained by the knowing use of false evidence.  There has been no deviation from that established principle. There can be no retreat from that principle here".

This filing serves as a Formal Notice of Criminal Liabilities:

The core intent of this action is restoration of the Liberty of Plaintiff. Actual evidence proves incontrovertibly that he is not only innocent of the preposterous crimes for which he remains imprisoned, but also that his restraint is a fraudulent cover-up of severe malice that is undeniably criminal in nature.

The cogent proofs that are articulated succinctly in this pleading establish grounds for the immediate dismissal of the underlying criminal case with prejudice.  Even moreso, the information provided herein sets the stage for tort action against criminal acts executed "under color of law".

Police brutality used as a weapon to 'create crimes' in the aftermath is already well documented in Mason County, Washington, USA.  This latest instance of insecure and incompetent State officials carrying out an asinine ambush of an unarmed citizen as a petty vendetta is not only sick and wrong, but it is also illegal.  Actual evidence proves these claims.

Accomplicement to, and Misprision of, felony attempt to murder by pre-planned ambush are both felonies per 18 USCS §§ 3 & 4, respectively.  There is no immunity or indemnification for anyone from these crimes, nor from the repetitive cover-ups that violate R.I.C.O. Law, 18 USCS §§§§ 1962-1965.

So, while this Motion seeks accountability to seminal US Law protecting Life, Liberty & Property, it also doubles as the first accurate Public Record filing of what really happened on the night of February 9, 2012 in the primitive forest on Dow Mountain in the Lake Cushman community above Hoodsport, Washington.

Accordingly, it also serves as public notice via the Court that violent, scheming criminals that are abusing their official positions are loose. In no uncertain terms, these people are grave threats to domestic national security. By due course of law, this filing also legally serves as public notification of misprision liabilities that accrue daily for all complicit parties.

## III. GROUNDS FOR DISMISSAL

Each of the following State Officials have incontrovertibly committed one or more of the following criminal acts resulting in the illegal theft of Plaintiff's Liberty in violation of the US Constitution, amendment VIII: premeditated Attempt to Murder under color of law, tampering with and forging fake evidence to recreate the scene of that Ambush and Attempt to Kill Plaintiff, Perjury, Fraud, Accomplicement to, and Misprision of, Felony in the form of Cruel & Unusual abuse of Plaintiff and his canine companion.

"The 14th Amendment prohibits the deliberate fabrication of evidence by a State official", as determined in 'Devereaux v. Abbey, 263 F.3d.1070, 1074-75 (9th Cir. 2001), continuing, "There is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."

Additionally, Plaintiff herein fulfills the requirements outlined in 'Costanich v. DSHS, 627 F.3d 1101, 1111 (9th Cir. 2010), "To prevail on a claim of deliberate fabrication, plaintiff must prove that (1) the defendant official deliberately fabricated evidence, and (2) the deliberate fabrication caused the plaintiff's deprivation of Liberty."

Considering that any single criminal act deployed by State in the malicious frame of Plaintiff shall result in complete Case Dismissal with Extreme Prejudice, Plaintiff stands on the repetitive acts of criminal malice, and misprision of them, as irrefutably proven herein.

Only the most salient examples of these crimes are described below for each of the main responsible villains, each of whose behavior represents an outrageous threat to the very stability of American society:

a) William Reed, Mason County Sheriff

Reed was never in any danger at the Tree Scene (Exhibit b.2) where he first purposefully and maliciously stalked, for at least 28 minutes, Plaintiff, before threatening him at gunpoint without cause on private property behind Plaintiff's private gates.

Ostensibly, in just 23 seconds (per Radio Log Exhibit a, @ 20:33:47 - Ivie is "leaving in a vehicle" to @ 20:34:10 - Ivie is "coming right at me"), from the

time that Plaintiff calmly drove his truck away from the Tree Scene, was prevented from going home by Adams' pre-planned blockade, and turned around to drive in the direction of the eventual shooting scene4, it is physically impossible that Reed had moved across the Tree Scene debris, and down the muddy and rutted access road, a total of over 125 steep yards.

Reed was never in any danger of being hit by Plaintiff's truck because he could not have been in Dow Ridge Road by the time Plaintiff passed by the access road (per Radio Log Exhibit a @ 20:34:35), still just 48 seconds after Plaintiff left the Tree Scene.

Likewise, Adams could not possibly have re-entered his vehicle and travelled from his blockade position in time to be within even 200 yards of Plaintiff's truck, let alone so close that Reed was prohibited from shooting at Plaintiff for fear of hitting Adams.  Reed is lying to invent dire straits when there were not (caused by Plaintiff, that is).

Reed was never at risk, and his theatrics of jumping out of the middle of the road to avoid being run over are hysterical fiction.  Reed had to recreate the Tree Scene and Dow Ridge Road events in order to conceal his real attempt to trap Plaintiff, and his incompetence in doing that, and fantasize about his own pathetically-contrived danger.  The incontrovertible time stamps of the Radio Log render Reed's account of events simple, criminal perjury.

'Gantt v. City of LA' 717 F. 3d 702, 707 (9th Cir. 2013) tagged such 14th Amendment violations as "Shocking to the Conscience", and goes on to identify such perjury by State officials as "Reckless and Malicious".

The police officer with a multi-year publicized history of harassing Plaintiff with false arrests and insecure hysterics, purposefully stalked Plaintiff and instigated the threatening confrontation with Plaintiff who was committing no crimes, but simply working on removing falling Skokomish Nation-owned timbers from within the common 'greenbelt' area of his gated residential community in compliance with Plaintiff's valid wood-hauling license.

b) Travis Adams, Mason County Sheriff

The only thing dangerous on Dow Ridge on the night of 2.9.12 was Adams, his belligerent driving and his criminal abuse of a governement-issue assault firearm.

This is a real-life hyper S.W.A.T. team leader who pathetically sought accolades for his make-believe theatrics when, in fact, all he really did was ambush an unarmed man and his dog in private woods with an AR-15 machine gun.

Per Radio Log Exhibit a @ 20:34:35, when Plaintiff drove past the Tree Scene access road in order to go home a different way, not only was Adams never even within 200 yards of Plaintiff's truck (contradicting Reed's tale) until Plaintiff had stopped to wait nearby the eventual Shooting Scene to ascertain who was actually coming at him on Dow Ridge Road and why, but the notion that there was a dangerous, miles-long, high-speed chase on treacherous mountain roads (RP 296 @ 24, 297 @ 17, 298 @ 8-16, 22, 299 @ 24, 300 @ 13, 19, 302 @ 21, 304 @ 25) is nonsensical babble that defies Newtonian physics.

Per Radio Log Exhibit a, from @20:34:35 to @ 20:36:24, a total of 1 minute + 49 seconds, Plaintiff's speed could not have been more than 17 miles per hour:

(1/2 mile) x (1.82 minutes) x (60 minutes per hour) = 16.5 miles per hour

Unless Adams has invented some sort of time travel machine that eluded Albert Einstein, then the first order of court business must be insisting that Adams provide a scientifically valid explanation of just how he was able to refute Isaac Newton's Laws of Bodies in Motion. Of course, Adams can do no such thing, which is why this entire case collapses under the weight of fables of the reconstruction.

Adams, not Plaintiff, frantically fabricated his own hysteria by pursuing a private citizen in his own private mountain community before failing to T-Bone Plaintiff's truck as Plaintiff turned into what Plaintiff had no idea would become the Shooting Scene.

And we haven't even come to the nadir yet, at the Shooting Scene where the fever-pitch insanity goes AWOL.  Exhibits b.3 Shooting Scene, and c. Expert Ballistic Analysis, page 18, contain the pictures worth a thousand words.  By proven fact as expressed by the ONLY authentic ballistics expert involved in this case (KSF), Adams belligerently and in an unwarranted attempt to kill, shot both an unarmed man and his dog at least 8 times with an AR-15 assault rifle, including 2 failed kill shots to Plaintiff's head after Plaintiff was unconscious in a ravine.

State's incompetent and forged ballistics testimony is, in the exact words of the only professional expert, "COMPLETELY CONTRARY" to reality (Exhibit c, page 5, line 7).  Adams lied to conceal the truth about his barbaric lunacy.

"No sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence", as determined in 'Halsey v. Pfeiffer', 750 F.3d 273, 292-3 (3d. Cir. 2014).

From Adams' twisted perspective, his biggest mistake was that he didn't finish the job.  Because Plaintiff survived, Adams & Co. had to contrive a false accounting.  From the pathetic failed effort to broadside Plaintiff's truck with a police vehicle, to the ensuing story about Adams' fairy-tale need to fire off 8 rounds of sniper rifle ammunition at an unarmed civilian simply trying to go home, to the irrefutable fact that Adams shot Plaintiff from behind the truck and totally invented the 'fear of being "squished"' (RP 320 @ 23), Adams is out of control.

This malevolent, criminal perjury worked in local and State courts systemically contrived to cover the scam.

But Plaintiff did survive, as do the facts in truth, and Truth is always greater than lies.

The jig is up.  It's only a matter of time until an unbiased tribunal is manifest.  The facts are simply too overwhelming.  (Meanwhile, yes, this document is an Official Public Record Notification that Adams, et. al., has tried to kill Plaintiff once, and Misprision liabilities will accrue under Law if he tries again).

By all accurate accounts, Adams' spastic behavior and ensuing parade of lies to hide the truth of his insanity represents a dire threat to the safety and stability of American society. The hero-pretend is a criminally malfeasant, out-of-control liar and menace with a machine gun.

c) Cameron Simper, Thurston County Sheriff, Lead Investigator

The only thing this chameleon lead investigator even researched was how to conceal truth. Incompetence and inexperience might be acceptable alibis in State of Washington courts, but Simper's burial and alternation of evidence is so blatant that it cannot pass unbiased scrutiny.

Simper commits serious perjury when he testified that he was not involved with biased, premature charging of Plaintiff with multiple assaults when, in fact, he did recommend the pre-charge of Plaintiff in the fixed case before even receiving rudimentary evidences (Thurston County Sheriff's Report, 2.10.12, Yellowhawk Road, Case No. 12-738, 3 pages).

Suppression of evidence that incriminates the bad State actors violates longstanding common sense evidence rules, including 18 USCS §§ 3 & 4, from which NO ONE has indemnification.

But Simper's burials are far more sinister.

As if it should even be necessary in light of the obvious hyjinx of evidence tampering, Simper shall inevitably be trapped by Mandamus accountability to the following exculpatory records that he purposefully participated in concealing:

1. AUDIO FILE: Complete Police Radio Call Detail Report on 2.9.12 between 17:00 and 21:00,

2. VIDEO: ALL surveillance camera footage from Adams' vehicle and the backup officers', inlcuding Deputy Sargent's,

3. AUDIO: police interviews 2 weeks after 2.9.12,

4. AUDIO: 2.10.12 hospital interrogation of Plaintiff,

5. DOCUMENT: a certified Thurston or Mason County Ballistics report signed by an authorized forensics expert, and

6. MATERIAL EVIDENCE: justification for the destruction of the Plaintiff's Dodge Dakota 4x4 Truck, not only crucial crime scene evidence, but also the still working asset belonging to the Plaintiff, along with thousands of dollars worth of logging equipment stolen and/or destroyed by State.

The day of Mandamus reckoning is inevitable.

Nevertheless, even the extant evidence included in this filing is more than sufficient to warrant case dismissal per 'US v. Throckmorton', 98 US 61, 25 L.Ed.93 (1878):

"FRAUD VITIATES EVERYTHING".

"FRAUD VITIATES EVERYTHING."

Consider the absurdity that evinces pre-staged fraud: Simper concluded his
sham ballistics "review" 4 days after the shooting, yet failed to even look at
Plaintiff's wounds (including 2 bullets that are STILL in the Plaintiff's
body) until 8 days after the shooting.  Simper not only didn't want to know
the facts, but he also made sure that they were not presented.

So, State has a choice: either uphold Law now, or exponentially increase
criminal culpability as more truth is exhumed by unbiased Court Order.


d) William Dorcy, Mason County Prosecutor

Prosecutorial Misconduct-Personified, it would be more efficient to list the
lines of his questioning that were not laced with deception and fraud.
Unfortunately for Dorcy, the WA State BAR will not be able to protect him from
the imminent flood of federal and World Court Tort claims against case-
fixing: because humans have Rights, no matter how much the devious persist in
trampling them underfoot.

Dorcy lied, in writing, about Plaintiff's rightful presence at the Jurors'
Questioning that was laced with confusion and unresolved issues by multiple
jurists.  Further, jurist Marjorie Steinke filed a written complaint with
Affidavit that she didn't believe Plaintiff was guilty of the assault charges,
but was intimidated by the Jury Foreman to stop questioning.  Dorcy suppresses
these cogent facts, in violation of Misprision statute (see Exhibit d).

Dorcy even went so far as to introduce false witnesses regarding the dynamics
of the local forestry industry in order to disparage fully licensed Plaintiff
(Exhibit e) and propagate diversionary confusion:

First, there are no owners of trees within the Lake Cushman community other
than the Skokomish Nation, and Plaintiff had mutual associations with its
members.  Dorcy knew that the witness who claimed that he owned the Maple tree
was lying under oath.

In fact, Plaintiff was working under valid "UNLIMITED" State of Washington
"Specialized Forest Products Harvesting Permit" (No. 23-157163, Exhibit e),
and was breaking no laws on 2.9.12.

Second, the valuation provided for the Maple tree was invalid, and Dorcy knew
this because Plaintiff had prevailed in a previous case against Dorcy over
this very issue (Maple Trial Acquittal on 11.8.08 in Mason County Case No. 08-
1664).

Maple music wood value can only be established after fine cutting and grading
the billets at a Mill.  Maple wood cannot be evaluated beyond firewood or pulp
without Mill inspection of the specific sample.  Dorcy intentionally
introduced a perjuring witness who valued wood that was not even there.  Dorcy
falsely disparaged the Plaintiff by fraudulently inflating the value of the
Maple tree in order to inflame the court and justify Reed's and Adams' use of
force as if Plaintiff was caught in the act of a high crime.

Dorcy's perjury created Red Herring diversions from the real crimes by State officials.  Dorcy is an Accomplice-After-The-Fact in violation of 18 USCS §3.


e) James Foley, Mason County Attorney

Every scam needs a wimpy "yes-man" too timid to stand for truth or honor. Enter Foley, whose pathetic tango of lies with Prosecutor-Misconductor Dorcy is so completely obvious that only a complicit judge could possibly let it go.

Foley aided and abetted the scandal by ensuring that facts in evidence, including those presented herein, were either not presented, or tampered with prior to presentation, or presented in such a way as to propagate confusion and perpetuate the reconstruction of the fables.

"Plaintiff suffered injury as a result of fabricated evidence and that fabricated evidence was the moving force that causes the ultimate injury" is precisely the circumstance here as previously described in 'Gravelet-Blondin v. Shelton', 728 F.3d 1086, 1096 (9th Cir. 2013).

Foley had full scienter that the forensics were fixed:  he admits that "the bullets don't match up" (VRP @ 780) but opts to do nothing about it in the epitome of Misprision of Felony.

Glaring Ineffective Assistance of Counsel has been addressed ad nauseum as an Olive Branch for State to concede to Justice with a modicum of honor intact. But State has resisted honor and integrity, so now truth stands in simple support of Plaintiff.


IV.  CONCLUSION

Plaintiff is imprisoned for crimes that not only are proven to have been physically impossible by all authentic forensic evidence, but also were fraudulently forged by State officials to conceal their own criminal acts. Witnesses' testimonies contradict each other and irrefutable facts of science and nature.  The police's Radio Call Log and the only professional ballistics report prove the rampant perjury.

State courts persist in taking State officials' testimony as truth and fact when, in fact, it cannot be true because it contradicts proof in evidence - even proof in the State's own records.

Such asinine forgery theatrics to conceal abusive police violence are already well-documented in Mason County.  Neither State nor US Constitutions can tolerate such egregious acts that are proven to be occurring again at this time.

In no uncertain terms, Murderers-for-Grudge Reed and Adams, Investigator-Pretend Simper, Prosecutor-Misconductor Dorcy, and Counselor-for-Cover-Up Foley are all lying.

Their actual records, replaced by forgeries at trial, prove it. These State officials are out of control: sworn to defend Law and protect citizens under it, they blatantly pervert it by abusing it as a weapon to terrorize civilians. Under the guise of patriotic duty, each is actually acting as a threat to American civilization. This is simply what the facts prove.

Therefore, impeachment is the only just and logical remedy.

Truth has an interesting way of manifesting its day of lawful reckoning, regardless of the peevish efforts by corrupt officials to conceal it. Such is the case here.

When weighed against the simple facts, the State's actions are obvious, outrageous, and criminal. All parties know this.

The ambush assault on Plaintiff's life was criminal in nature. But before that is legally addressed, the equally tyrannical theft of his Liberty (for police-contrived crimes that never actually happened) needs to be terminated.

Elementary logic evinces fraud. Actual evidences prove the criminal malice by the Defendants' officials. Law & Order demand the immediate restoration of an innocent victim's Liberty.

Respectfully & Sincerely submitted on this _23_ Day of _February_, 2019, under penalty of perjury by the Laws of the United States of America.

Signature: _____

Name: _Martin Ivie_

ii. APPENDIX OF EXHIBITS

a. Radio Log (1 page)

b. Crime Scene Maps with Declaration (4 pages)
    1. Overview
    2. Tree Scene
    3. Shooting Scene

c. Expert Ballistic Analysis (KMS Forensics, 24 Pages)

d. Notice of Court Misconduct with Juror (1 page)

e. Plaintiff's Valid "UNLIMITED" Forest Products Harvesting Permit
    (1 page)

Exhibit a

*Log of Reed's Radio Communication to Sgt. Adams*
*Coming right at you. Coming Right at me.*

Mason County Emergency Communications    Page: 2087
CALL DETAIL REPORT    1

_1/12
15:48

Call Number:   12-005273

Nature: 38A.Forest Prod                *Incompetance!*
Reported: 17:15:56 02/09/12
Rcvd By: Fulton,Carla    How Rcvd: T    *This is Mr Foley's Notation.*
Occ Btwn: 17:15:56 02/09/12   and 17:15:56 02/09/12   *He thinks Reed had 25 sec.*
Type: 1f
Priority:                         *He thinks Reed had 25 sec.*

Address: N DOW RIDGE RD    *to get out of the way when*
City: Hoodsport

Alarm:          *Reed had 25 seconds to make*   *2 sec to get*
*it from the tree to Dow*   *sec to get out of the WAY*
COMPLAINANT/CONTACT   *Ridge Rd.*    Name#:   1178

Complainant:
Race: W  Sex: M  DOB: **/**/
Address:                       Work Phone:
Home Phone:

Contact:
Address:
Phone: ( )

RADIO LOG

| Dispatcher | Time/Date | Unit | Code | Zone | Agnc | Description |
|---|---|---|---|---|---|---|
| Fulton,Car | 17:18:21 02/09/12 | 1P52 | ASN | L079 | MCS | incid#=12-01779 Assigned to Call call=901 |
| Fulton,Car | 18:07:04 02/09/12 | 1P52 | BUSY | L079 | MCS | incid#=12-01779 in the area of the wood theft; NO STATUS call=901 |
| VanCleve,V | 20:03:56 02/09/12 | 1P52 | BK | L079 | MCS | incid#=12-01779 suspect on site call=901 |
| VanCleve,V | 20:04:04 02/09/12 | 1S13 | ER | L079 | MCS | incid#=12-01779 Enroute to Call call=901 |
| VanCleve,V | 20:23:53 02/09/12 | 1S13 | IA | L079 | MCS | incid#=12-01779 In the Area call=901 |
| Fulton,Car | 20:31:52 02/09/12 | 1P52 | NOTE | L079 | MCS | one at gun point stay on dow ridge rd to the first cabin |
| Fulton,Car | 20:32:44 02/09/12 | 1P52 | NOTE | L079 | MCS | 1 being uncooperative leaving in a vehicle |
| Fulton,Car | 20:33:37 02/09/12 | 1P52 | NOTE | L079 | MCS | coming right at 1s13 |
| Fulton,Car | 20:33:47 02/09/12 | 1P52 | NOTE | L079 | MCS | coming at me |
| Fulton,Car | 20:34:10 02/09/12 | 1P52 | ER | L079 | SKO | incid#=12-SK0056 Enroute to Call call=901 |
| Fulton,Car | 20:34:35 02/09/12 | 4P4 | ER | L079 | MCS | (MDC) Assisting unit 1P52 |
| Heinrich,M | 20:35:46 02/09/12 | 1M21 | ER | L079 | MCS | incid#=12-01779 call=901 hy 119 mp 5 that's where |
| Sargent,Mi | 20:35:48 02/09/12 | 1P52 | NOTE | L079 | MCS | they should come out they've taken off again |
| Fulton,Car | 20:35:55 02/09/12 | 1S13 | NOTE | L079 | SKO | incid#=12-SK0056 Enroute to |
| Fulton,Car | 20:36:24 02/09/12 | 4P4 | ER | L079 | MCS | Call disp:ACT call=901 |
| VanCleve,V | 20:36:40 02/09/12 | | | | | |

*20 MIN*

*2 min*

*3 min*

*My Notations*    16 / 37 / 53

*2 min*   *20 38 56 Shots Fired*

d

DECLARATION OF MARTIN STANLEY IVIE

I declare under penalty of perjury under the laws of the United States that
the following is true and correct to the best of my knowledge:

The attached Crime Scene Maps contain, in order, graphical details of the
events that transpired on the evening of February 9, 2012, when I was ambushed
and shot by State of Washington officials, William Reed and Travis Adams:

    ONE - Overview
    TWO - Tree Scene
    THREE - Shooting Scene

The detailed facts shown are true and accurate, and supported unanimously by
all authentic forensic evidence.

Dated this 21st Day of February, 2019.

_____
Martin Stanley Ivie







Exhibit b.Z

TWO - TREE SCENE

• NOT TO SCALE •

• THE AMBUSH OF MARTY IVIE •

* Very heavily Wooded Old Growth Rain Forest

~ 60 yards

~ 30 yards

~ 100 yards

Big Maple Tree
Trunk, ±120'
high + ±80'
wide w/ branches

Reed @ 20:33:34

Reed @ 20:33:47

extensive debris

Ivie's Truck

• Ivie
• Shane

Ivie's Truck Travel

Reed standing beside road @ 20:34:35
(NOT in Roadway) Now Ivie drives past at < 20 mph

to Shooting Scene

Down Ridge Rd.

Frank's Cabin

Ivie's exhaust w/ negative results

to Adams' Stakeout Ambush Location

Blockade with AR-15 Machine Gun
(out of Crown Victoria @ 20:34:10)

Ivie sees lights in trees ahead and R turns here

by YM[?]  2/9

Exhibit b.3

# THREE — SHOOTING SCENE

- NOT TO SCALE -

*Adams' True Shot Position

@ Cynthia Lassiter's Building Site w/ 5th Wheel Camp Trailer

"SHOTS FIRED"
@ 20:38:56

per KMS Forensics expert

Adams Parked To Block Driveway

Ivie's Truck After U-Turn

5th Wheel

slides in ravine post-shots

Adams' testimony defies physical law. His hysterical, furious attempt to kill Ivie defies Criminal law.

*Adams shot Ivie and his dog Shane from in front of the Crown Victoria, totally absent of ANY danger

Ivie Avoids Getting T-Boned @ entrance by Maniacal Adams

≈ ½ mile to True Scene

by TWT c/19

Ivie's Truck @ 20:36:24

Dow Ridge Road

- THE AMBUSH OF MARTY IVIE -

IN THE SUPERIOR COURT OF WASHINGTON

FOR MASON COUNTY

| | |
|---|---|
| State of Washington, | Case No.:   12-1-00064-6 |
| Respondent/Plaintiff | |
| v. | DECLARATION OF KAY SWEENEY |
| Martin S. Ivie, | |
| Petitioner/Defendant | |

I declare under penalty of perjury under the laws of the state of Washington
that the following is true and correct to the best of my knowledge:

1)  I am a forensic scientist and the principal forensic scientist for KMS

Forensics, Inc. an independent laboratory and consulting enterprise.  My

Curriculum Vitae is attached hereto which outlines my professional

training and associations, employment, experience and credentials.

Among the positions I have held in over 50 years working as a forensic

scientist are state-wide Program Manager for the WSP Crime Scene

Response Team, Crime Laboratory Manager for the WSP/CDL Seattle,

DECLARATION OF KAY M. SWEENEY

In re Ivie, App. 1



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Chief Criminalist for the WSP/CDL in Seattle, Crime Laboratory

Director for the King County Sheriff's Office and Criminalist for the

Seattle Police Department's Crime Laboratory.  I have taught, consulted,

made numerous presentations, and conducted research in forensic science

and in particular in the area of crime scene reconstruction to include

bullet trajectory identifications and documentation. I have been asked to

consult and conduct laboratory examinations and analysis of physical

evidence in numerous cases involving the complex evaluation and

interpretation of crime scenes where firearms have been discharged.  I

have testified as an expert witness in State and Federal Courts throughout

the State of Washington and in several other states.

2)  I am familiar with the Total Station Mapping System as I was the

manager for the WSP Crime Scene Response Team and responded to

crime scenes and supervised the processing of crimes scenes where this

equipment was employed.

3)  I was asked by Mr. Ivie's post-conviction attorney to review evidence

related to the February 9, 2012 shooting that occurred on Dow Mountain,

Washington that resulted in Mr. Ivie being charged in Mason County

DECLARATION OF KAY M. SWEENEY

In re Ivie, App. 2

Superior Court with several charges to include Assault First Degree involving Mason County Deputy Adams.

4) I was provided with   crime scene and evidence photographs, computer generated diagrams prepared from use of the Total Station Mapping System, trial testimony, and witness statements and police reports from the Mason and Thurston County Sheriff's Office.  I was also provided with a report prepared by a defense firearm consultant Marty Hayes. I was also provided with Mr. Ivie's medical records, photographs of his bandaged injuries, and his hospital x-rays.

5) Mr. Ivie's truck was no longer available for examination as it had been destroyed.  The firearm employed by Deputy Adams was also no longer available as it had been placed back in service.  However, I was provided with police produced photographs both from the crime scene and police impound area which showed the damage and bullet defects to his vehicle.

6) I was also able to laboratory examinations and analysis of the clothing Mr. Ivie wore at the time of the incident.

7) I was specifically asked to examine the available evidence and offer an opinion regarding the bullet trajectory from shots fired by MCSO Deputy

DECLARATION OF KAY M. SWEENEY

Adams and the relative positions of Deputy Adams, Adams patrol car,

and Mr. Ivie's vehicle at the time the shots were fired.

8) A detailed report of my review and examination of the evidence is

contained in the attached POST CONVICTION LABORATORY

REPORT.

9) Based on my review of the evidence made available to me, Deputy

Adams was not in the direct line of travel by Mr. Ivie's truck at the time

any of the eight shots were fired. Figures 19 and 20 of my report

document my opinion regarding the positioning of Deputy Adams, his

vehicle and Mr. Ivie's truck at the time Deputy Adams fired.  Figure 19

documents my opinion regarding Deputy Adams location when he fired

the first volley of four shots.  Figure 20 documents my opinion regarding

Deputy Adams position when he fired the second volley of four rounds.

10) When Deputy Adams fired the first volley of shots he was positioned in

front of, and slightly to the left of the hood of his police vehicle and to

the left of Mr. Ivie's vehicle and approximately even with the driver's

door of Mr. Ivie's truck.

11) When Deputy Adams fired the second volley of shots he was positioned

directly in front of the driver's side of the hood of his vehicle.  Mr. Ivie's

DECLARATION OF KAY M. SWEENEY

vehicle was well past the rear of Deputy Adams vehicle and down the wooded embankment.

12) Police photographs and diagrams depicting the trajectory of defects #3 and #4, included in my report at figures 6 and 9, are grossly inaccurate and completely contrary to the morphology of those two defects. The police photographs of the trajectory for defects #3 and #4 appear to show the trajectory as from front to back at a shallow angle when an examination of these defects clearly shows that the bullets that created these defects came from back to front. Figures 12 and 13 of my report show the distinct characteristics of defects #3 and #4 which support my conclusion that the trajectory for these defects was from back to front, and not front to back as the police demonstration and digram depicts.

13) At the time the bullets that created defects #3 and #4 were fired, Mr. Ivie's truck was over the embankment and well past Deputy Adams' car.

14) The position of firearm discharge that I have indicated in figure 20 is an ideal position for direction of fire through the right glass panel of the three panel rear window and out the passenger's door window.

15) If called at a trial or hearing in this case I would provide testimony consistent with this declaration and my report attached hereto.

DECLARATION OF KAY M. SWEENEY

In re Ivie, App. 5

1

DATED this 3ʳᵈ day of October, 2016.

2

*In Kirkland Washington.*

3

4

_____

Kay M. Sweeney

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF KAY M. SWEENEY

In re Ivie, App. 6



**KMS FORENSICS INC**

PO Box 2458 - KIRKLAND, WA 98083
phone & fax = (425) 814-3244

Peter Camiel, Attorney at Law
2101 Fourth Avenue, Suite 1900
Seattle, WA 98121

*Re: State v. Martin S. Ivie; Laboratory #2k16-010; Cause #12-1-00064-6*

## POST CONVICTION LABORATORY REPORT

**Brief Background:**

Court records record that on the night of February 9, 2012 MCSO Deputy Reed hid near a downed maple tree waiting to see if someone would come to cut it and take wood. Martin Ivie arrived at approximately 8:00pm in his Dodge Dakota pickup. Reed confronted and tried to arrest Ivie. Reed and Ivie knew each other and Reed knew where Ivie lived. Ivie told Reed he intended to take his dog home and that Reed could come arrest him at his home. Over Reed's objections, Ivie got in his truck and drove off. In the meantime, MCSO Deputy Adams was coming up the road in his police car to back-up Deputy Reed. Adams, upon hearing by radio that Ivie was headed his way, stopped his car and exited with his assault rifle. Ivie apparently saw Adam's car's lights, stopped, turned his truck around and headed up the road where Reed had been following him on foot. Reed claimed that Ivie drove right at him and that he had to jump out of the road to avoid being hit. This formed the basis for count 3, Assault First Degree. Adams pursued Ivie up the winding narrow dirt road for miles. At one point Ivie, after making a right turn, began to back up. Adams braked and the two vehicles made contact. This contact formed the basis for count 5, Assault Third Degree. Ivie then took off again. Ivie drove to a landing at the end of the road near an unoccupied trailer. Adams drove up to the landing but stopped his car just short of the landing and got out with his assault rifle. Adams claimed that Ivie made a turn with his truck and drove directly toward Adams. Adams claimed he ran to his right to get out of the way and at that moment fired four shots at Ivie, followed by four more shots as Ivie drove past him. This formed the basis for count 6, Assault First Degree. Shots from Adams' assault rifle struck Ivie and his truck crashed down a wooded bank and came to a stop. Ivie had sustained a number of bullet wounds—all to the back side of his body. Emergency medical technicians arrived and transported Ivie to Mason General Hospital (MGH). The attending surgeon at MGH, John Short, M.D., transferred Ivie to Tacoma General Hospital (TGH) late that night, February 9th. On February 10th, at approximately 12:15 p.m., two investigating law enforcement officers interrogated Ivie, who was under guard while in the TGH Intensive Care Unit. At trial the State introduced exhibits including demonstrative photographs of the bullet holes in the driver's side of Ivie's truck with rods of different colors placed to depict the trajectory of the bullets fired by Adams. Those photographs along with computer-generated diagrams depicting the bullet trajectory were based on the claim and purported to demonstrate that Ivie had been driving at Adams and that Adams had initially fired his weapon as Ivie was driving toward him.

I have been asked to review selected information and materials relating to the above identified case in an effort to reconstruct elements of the shooting to the extent possible based on the available information and materials. To that end I have reviewed scene diagrams and several photographs taken by police investigators and I have conducted laboratory examinations of a limited number of items of physical evidence collected and preserved by law enforcement investigators.

While assigned to the Washington State Patrol, Crime Laboratory Division (WSP/CLD) Headquarters I was

charged with the duty to form a state-wide WSP Crime Scene Response Team (CSRT). My CSRT duties included the design of the CSRT program, development of training for team members, writing of a WSP Regulation Manual chapter defining CSRT role and operation, writing WSP Training Bulletins detailing CSRT function, writing announcements for distribution to law enforcement agencies relative to services available from the CSRT and protocols for call-out, and coordinating all activities of the CSRT including receiving all calls via pager, dispatching customized teams for response to scene assistance requests, responding in person to scenes and managing the activities of team members on the scene. Many of those scene responses required the documentation of the scene by total station techniques and the use of those techniques and their results were part of my responsibility. The subject case of this report involves such evaluation and interpretation.

**Scene:**

Photographs depict a bright blue Dodge Dakota extended cab, two door, 4x4 pickup in a wooded scene, off road and against or next to brush, trees undergrowth and disrupted soil; views include a dirt roadway running to a parked fifth wheel mobile camping structure and associated yard improvements along with a police vehicle parked on the dirt road leading to the camping structure. The Dodge Dakota pickup was reportedly being driven on the scene by Martin S. Ivie.

A scene diagram prepared by police investigators is apparently intended to essentially depict the position of vehicles, fifth wheel camper, expended cartridge casings, broken glass, other objects and tire tracks of the Dodge Dakota pickup's travels (See Figure #1). This diagram and investigative reports show and describe the Dodge Dakota pickup approaching the scene property along the dirt roadway and coming to a stop adjacent to the camping vehicle (fifth wheel) where the road ends. The Dodge Dakota pickup's tire tracks arc from the dirt road into/beyond the road end for approximately 70 feet but this diagrammed arc does not connect to tracks that proceed away from the arc. The pickup tracks leading away from the arc are diagrammed as beginning near the end of the arcing tracks and proceed back toward the parked police vehicle by crossing the yard of the residence, crossing the dirt road behind the parked police vehicle and continuing in nearly a straight line into the woods below (in elevation) the level of the dirt road. The left side tire track of the pickup passes within just over three feet off the rear left bumper end of the parked police vehicle and the tracks are diagrammed as traveling approximately 105 feet from start to finish. The pickup obviously side swiped at least one sapling sized tree causing loss of bark to the tree and exterior sheet metal buckling of at least the left front fender, the left side door and left side quarter panel and the driver's side outside mirror appears to have been recently forcibly removed. A side view mirror was photographed on the ground somewhere along the path of the pickup into the woods; the mirror does not appear on the diagram and it apparently was not given an evidence scene marker number nor was it collected as evidence. Scene photographs depict the pickup with glass missing from the driver's door, the entire quarter side window to the rear of the driver's door, from a portion of the right window pane of the three pane rear window and from the passenger's side door. Apparent bullet impact/passage defects are depicted in the driver's door sheet metal, left side quarter panel sheet metal and passenger's door sheet metal.

At least two areas of significant broken auto side window type glass deposits were documented by photographs and in the diagram. One deposit is noted to the right side of the tracks left by the pickup truck at a point approximately 20 feet from the start point of straight line track depiction that ends in the woods and approximately 20 feet from the driver's side of the parked police vehicle (See Figure #1).

The other glass deposit is documented in the diagram as being on the ground between the right and left tire tracks of the pickup at a point approximately 44 feet from the start point of the straight line track depiction that ends in the woods. The position of this deposit measures approximately five feet from the left rear bumper end of the parked police vehicle (the closest point in measurement from the police vehicle) (See Figure #1). Photographs show a deposit of broken window glass between the left tire track of the pickup and the left rear bumper end of the parked police vehicle where the glass deposit extends under the left rear bumper end of the parked police vehicle (See Figure #2).

Two groups of eight total expended cartridge casings are depicted in photographs and on the diagram of the scene (See Figure #1). One grouping of four casings occupies an area of approximately 8.5 feet by 2 feet on the

ground and the other is a linear grouping of four casings occupying an area approximately four feet long.  The groupings are a little over seven feet apart at their closest boarder.

A diagram that is apparently meant to represent the bright blue Dodge Dakota pickup was also prepared by police personnel and it includes apparent bullet trajectory lines and a scale (See Figure #9).

The scale included on the diagram of the scene is off/inaccurate (See Figure #1).  When compared to the scale of the pickup, the scales are equal at five foot increments, however the scene diagram's scale has equal increments for one foot, two foot and three foot spacing but the length of the increment for the four foot spacing is larger.  It appears that the one foot through three foot marks are too close together and the distance between the three foot and four foot marks is made larger to accommodate for the inaccurate shorter distance between the one foot through three foot marks.  The same discrepancies are noted in the five foot to ten foot markings.

**Injuries:**

Martin S. Ivie is described in the Washington State Driver's License that he carried at the time of this incident as 6 feet 3 inches tall and 255 pounds in weight and photographs taken of him in police custody support that data.

Mr. Ivie suffered bleeding injuries to the back of his head, his upper right back between his spine and his right shoulder, his lower left back, and the back of his left forearm near the elbow (when viewed from behind Mr. Ivie while he is standing with his arms extended down along his side) (See Figures #3 and #4).  All injuries are covered with bandaging as depicted in photographs.  No photographs of open wounds were submitted to this laboratory.  X-rays of Mr. Ivie's upper torso show a distribution of radio opaque particulate in his right upper back area.

**Evidence Examination:**

*Item: One Bushmaster Model XM15-E2S, .223 caliber rifle;* was reportedly fired on the scene by Sgt. Adams and was the only firearm discharged on the scene.  This firearm was not available for examination and analysis by this laboratory, however a witness during police test firing of this rifle determined that when fired it discharged expended cartridge casings to the right to a distance of approximately twelve feet.

*Item: One bright blue Dodge Dakota pickup with Washington State License plate # B76920H;* was transported from the scene to police storage where it was examined and documented by police personnel.  The pickup was later released to local fire department personnel who ultimately subjected the pickup to several set fire experiments/exercises.  The pickup was therefore not available to this laboratory for laboratory examination and analysis.  The vehicle was photographed both at the scene and while in police custody.  Those photographs depict significant quantities of apparent volume blood deposits (such as from actively bleeding wounds) on the driver's seat area (both seat bench and back support sections), on the clothing item on the driver's seat back, on the driver's door panel, on the center console and on areas in the rear seating (extended cab) space behind the driver's seat; apparent contact transfer blood staining on most all of those same areas; and apparent blood smearing on most all of those same areas.  Contact transfers, smearing and volume apparent blood deposits in the rear seat area also include fine wispy streaks typical of bloody hair brushing against the deposit surface.  Two such areas appear on either side of the left side quarter window opening and on the plastic above the driver's side seat back area of the seating behind the driver's position (See Figure #5).

Missing window glass was noted in the driver's door, quarter side window on the driver's side, right panel of the three panel rear window and the passenger's door window.  A significantly larger amount of glass is missing from the pickup's broken rear window panel as depicted in the police storage facility than depicted at the scene.

Driver's door window glass observations:  Photographs of the pickup at the scene show a large amount of glass on the driver's seat and driver's floor.

Driver's side quarter window glass observations:  This window is a flipper style window with a vertical hinge at the front edge allowing it to be opened at the rear edge by release of a clamp style mechanism attached to the glass by a Phillip's head through bolt.  The window is thus frameless and seals against the outside environment by pressure, when clamped closed against a rubber weather strip that is mounted completely around the quarter window opening in the cab sheet metal.  Photographs depict a small amount of glass in the clamping closure mechanism of this window at the through bolt mount and at the vertical hinge site but otherwise the entire window pane is missing.  Scene photographs depicted heaped materials on the inside of the pickup behind the driver's seat and therefore covering the rear seat bench and seat back in that area and no broken glass can be seen in that area meaning that no interpretation can be made about whether there was broken glass in that area or not at the scene.  Police processing photographs depict the seating in that area before removal of all covering objects and a small amount of broken glass is visible on the left side seating area and on a portion of the covering objects in view.  One photograph depicts a limited section (center left) of the floor in the left rear seating area and no glass is visible on he floor in that view.

Right side panel glass of the three glass panel rear window observations:   A vertically oriented (with a backward slant as depicted both at the scene and in police custody) venetian style structure of horizontal steel slats welded to vertical rods is depicted in the bed of the pickup.  This venetian style grillwork is noted to be essentially covering and protecting the rear window glass from impact by objects carried in the bed.  The horizontal slats are spaced such that small objects, such as bullets, could pass through without impacting the slats.  No damage is noted in photographs to the exterior of this structure and the interior of the structure is not depicted.  A photograph taken during police processing of the pickup shows one apparent window glass fragment in the bed of the pickup near the vertical slatted structure covering the rear window.  A significant amount of broken glass is depicted on the right rear seat bench, below the broken window.

Right side door window glass observations:  A rounded hole with protruding ragged edges typical of bullet exit in sheet metal is noted just below the bottom edge of the window opening in the right side door.  A significantly smaller amount of broken glass is depicted inside the pickup on the right front passenger's seat and on the floor in the same area than was noted on the driver's side.

Photographs taken during police processing of the pickup depict a small number of window glass fragments positioned on top of the passenger's side dash above the glove box and near the center of the dash at the windshield.  Scene photographs show a thick stack of papers on the dash above the glove box with broken glass on top of the papers.

Bullet impact and passage defect observations:  Several fired bullet impact sites are obvious in submitted photographs of the bright blue Dodge Dakota pickup and they were apparently arbitrarily designated with numbers 1, 2, 3, 4, 6, 7 ,8, 9 and 10 (See Figures #6, #7 and #8) with number 5 assigned to the right rear window of the three window sectioned rear window which was obviously believed to have been broken out by gunfire.  All numerical labeling included a two inch scale with a numeral hand written in black ink on the scale.  The scale was placed directly under the defect in all instances so that scales placed on the left exterior of the vehicle would align with the left end of the scale toward the front of the vehicle, scales placed on the right exterior of the vehicle would align with the right end of the scale toward the front of the vehicle and so on.  Observations stated in this report will refer to the numbering system as designated above.  Photographs taken by police investigators depict bullet impact/passage defects and in addition, defects #1, #2,  #3, #4,  #7 and #9 include bullet trajectory probes apparently intended to demonstrate direction of travel of bullets as they entered various parts of the vehicle.  The trajectory angles represented by the photographed positons of these probes were then transferred by police investigators to a diagram of the pickup using five red lines entering the vehicle's left side with one continuing on to exit the right side of the pickup (See Figure #9).  The following interpretations can be made relative to these trajectory lines considering their entry points into the left side of the vehicle and moving from front to back;

The first line is apparently meant to depict a bullet entry into the driver's door (left to right relative to the centerline of the pickup) at defect #1 that exits the interior driver's door panel at defect #6 where it continues on passing through the interior of the vehicle until it enters the interior door panel of the right door at defect #8 and exits the passenger's door at defect #7. The bullet trajectory is defined as left to right and slightly front to back, in other words slightly off a 90 degree (perpendicular) entry.

The second line is apparently meant to depict bullet entry into the vehicle through the driver's door window (left to right relative to the centerline of the pickup), pass through the interior of the vehicle and impact the front passenger's seat belt point of attachment to the upper interior right side cab structure at bullet defect #9.

The third line is apparently meant to depict bullet entry into the driver's door at defect #2 (left to right relative to the centerline of the pickup). The bullet trajectory is defined as left to right and slightly front to back, in other words slightly off a 90 degree (perpendicular) entry.

The fourth line is apparently meant to depict bullet entry into the driver's side quarter panel at defect #3. The bullet trajectory is defined as left to right relative to the centerline of the pickup and front to back approaching at a shallow angle.

And the fifth line is apparently meant to depict bullet entry into the driver's side quarter panel at defect #4. The bullet trajectory is defined as left to right relative to the centerline of the pickup and front to back approaching at a shallow angle.

Bullet defect #1 observations: This is a round, approximately 1/4 inch diameter hole in the driver's door exterior at a point approximately 2 inches down from the window opening and approximately centered between the front edge of the door and the back edge. The edge of the hole oriented toward the rear of the vehicle has an irregularly shaped raised lip extended outward from the exterior surface of the door sheet metal with the rest of the hole margin bent inward; these characteristics are typical for bullet entry and the raised edge of the hole toward the rear of the vehicle is a characteristic of bullet entry along a trajectory from front to back relative to the length of the vehicle (See Figure #10). The angle of trajectory for this defect is front to back with a small angle of deviation from a 90 degree (perpendicular) entry into the left side of the vehicle (large angle, but short of 90 degrees, with respect to the side of the vehicle). Apparent tree bark is present on the ragged, raised metal lip.

Bullet defect #2 observations: This is a round, approximately 1/4 inch hole in the driver's door exterior at a point approximately 10 inches down from the window opening, directly below the driver's door handle and approximately 7" from the back edge of the door. The edge of the hole oriented toward the rear of the vehicle has a raised lip extended outward from the exterior surface of the door sheet metal with the rest of the hole margin bent inward; these characteristics are typical for bullet entry and the raised edge of the hole toward the rear of the vehicle is a characteristic of bullet entry along a trajectory from front to back relative to the length of the vehicle (See Figure #11). The angle of trajectory for this defect is front to back with a small angle of deviation from a 90 degree (perpendicular) entry into the left side of the vehicle (large angle, but short of 90 degrees, with respect to the side of the vehicle).

Bullet defect #3 observations: This is an oblong, approximately 1&1/8 inches long, irregularly shaped hole in the driver's side exterior, quarter panel sheet metal at a point approximately 10 inches down from the quarter panel window opening directly above it, and approximately 10 inches to the rear of the vehicle from the back edge of the driver's door. Exterior sheet metal in the area of this defect has been irregularly reshaped by impact most probably from contact with a tree or trees. The edge of the hole oriented toward the front of the vehicle has a ragged raised lip extended outward from the exterior surface of the quarter panel sheet metal and a gaping hole, the length of which is oriented toward the rear of the vehicle, that has one edge burnished in a manner typical of bullet skid; the rear end (toward the back of the vehicle) of the oblong hole consists of a tab of metal bent inward away from the exterior surface; these characteristics are typical for bullet entry at a shallow angle relative to the surface of the metal, and in this case along a trajectory from back to front relative to the length of the vehicle (See Figure #12). The angle of trajectory for this defect is back to front with a large angle of deviation from a 90

degree (perpendicular) entry into the left side of the vehicle and a small angle with respect to the side of the vehicle.

Bullet defect #4 observations: This is an oblong, approximately 3/4 inch long fairly uniformly shaped hole in the driver's side exterior quarter panel at a point approximately 24 inches down from the quarter panel window opening and approximately 18 inches to the rear of the vehicle from the back edge of the drive's door. Exterior sheet metal in the area of this defect has been irregularly reshaped by impact most probably from contact with a tree or trees. The edge of the hole oriented toward the front of the vehicle has a ragged raised lip extended outward from the exterior surface of the quarter panel sheet metal; and a gaping oblong hole oriented toward the rear of the vehicle; the rear end (toward the back of the vehicle) of the oblong hole consists of a tab of metal bent inward away from the exterior surface; these characteristics are typical for bullet entry along a trajectory from back to front relative to the side of the vehicle and at a shallow angle relative to the side of the vehicle (See Figure #13). The angle of trajectory for this defect is back to front with a large angle of deviation from a 90 degree (perpendicular) entry into the left side of the vehicle and a small angle with respect to the side of the vehicle.

Broken window pane designated #5 observations: No bullet impact defect can be located.

Bullet defect #6 observations: This defect consists of broken out plastic of the interior driver's door panel at a point just below the top edge of the door panel and nearly centered between the front and rear edges of the door (See Figure #14). This positon corresponds with the position of the bullet entry defect on the exterior of this door at defect #1.

Bullet defect #7 observations: This defect is a rounded hole in the exterior sheet metal of the passenger's side door and is located at the lower edge of the window opening approximately 10 inches from the back edge of the door (See Figure #15). Characteristics of this hole include protruding sheet metal around the circumference of the hole with tearing of the metal. These characteristics are typical of bullet exit.

Bullet defect #8 observations: This defect area consists of at least three points of impact and penetration in the interior door panel of the passenger's side door near its top edge and corresponding to a positon in the door panel with the location of the exterior bullet exit defect at defect #7 (See Figure #16). The three impact defects range in size from approximately 1/4 inch to 1/2 inch

Bullet defect #9 observations: This defect area consists of perforation damage to the front passenger's seat belt fabric at a point where it is attached to the interior of the passenger's side metal door pillar into which the passenger's door latches when closed. Damage is also noted to an underlying buckle assembly that is part of the attachment system, plastic covering the door closure pillar and metal of the door closure pillar. Small nicks are noted in the plastic covering in this same area and in the paint of the interior passenger's door frame near the seat belt attach point (See Figure #17).

Bullet defect #10 observations: This defect area consists of two penetration holes, and other nicks in the paint, in the interior surface of the vertical section of the passenger door's window frame at the back/rear edge of the door. The defects are located approximately 10 inches above the lower window frame level and the detail in these defects that is visible indicate an entry angle of slightly back to front with respect to the length of the vehicle (See figure #18).

Additional observations: Small nicks are noted in the left facing end of the driver's seat headrest that are typical of high speed impact of small, hard particulate such as bullet fragments, other metal fragments, glass, etc. This headrest was positioned in the vehicle at the scene such that it was adjacent to the left side quarter panel side window in the extended cab space behind the driver's seat.

*Item #21, black shirt (suspect);* this item contains a previously cut, black/dark gray button front, short sleeve

In re Ivie, App. 12

"CINTAS, 3XL" shirt.  The front of this shirt had been previously cut in multiple places and directions and is obviously the result of preparing Mr. Ivie for emergency medical intervention.  Several areas of this shirt exhibit apparent blood staining.  The front of the shirt is stained and dirty with areas of soil deposits.  Two torn/cut holes are noted in the lower left back area with associated apparent blood staining.  A large ragged-edged hole approximately 1 & 1/2 inches long is noted to the right upper back area between the back centerline and the right shoulder (approximately 2 & 1/2 inches to the right of shirt back centerline) with associated apparent blood staining and tissue deposits.  The margin of this large ragged hole was subjected to X-ray Fluorescence Spectrophotometry (XRF) analysis and was found to contain a high level of lead indicating the passage of a fired bullet.  The back of the shirt is noted to be largely stained with apparent blood.

*Item #22, green shirt (suspect),* this item contains a previously cut, stained, long sleeve, thermal style, dark green 'Naturalife, XXL, 100% cotton' shirt.  The shirt has been previously cut along both sleeves and its front, again for purposes of medical intervention.  The front of this shirt is noted to support  apparent glass shards, plant parts and soil deposits.

A large ragged hole is noted in the upper right back between the garment centerline and the right shoulder with apparent blood staining, tissue fragments, plant parts, soil particulate and glass particles present.  This defect in the fabric is located in essentially the same area as a defect described in the black short sleeved shirt described in Item #21 above.  XRF analysis of the margins of this defect identified the presence of elevated lead levels indicating fired bullet passage.

There is a large hole on the lower left back area with associated apparent blood staining and tissue deposits.

A grouping of at least five holes were noted concentrated on the back of the left forearm area of the shirt, just below the elbow as viewing the shirt from the back while it is being worn with the arms of the wearer extended down along each side of their body.

The upper back, right shoulder and back of the right sleeve are heavily stained with apparent clotted blood and associated staining.

*Item #23, black pants (suspect);* this item contains a previously cut, stained, black '70LEWBL 42x32, 100% cotton' pants.  The pants have cuts from the bottom of the front zipper through both pant legs and bottom edges.  There is light red brown staining on the front, back and inside waistband.  Over all the pants have wood shavings, plant parts and soil deposits.  There does not appear to be any fired bullet impact or passage damage on these pants.

*Item #27, rain pants (suspect);* this item contains a previously cut, stained 'Gage, XX-Large, 100% nylon' rain style paints with a black fabric belt.  The fronts of the pants are cut from the top right waistband to the bottom of the right pant seam and from the bottom of the zipper to the bottom of the left pant leg.  The upper back waistband supports apparent blood staining.  There does not appear to be any fired bullet impact or passage damage on these pants.

## Reconstruction Assessment:

Bullet impact and passage damage to Mr. Ivie's bright blue Dodge Dakota pickup has been described in previous pages of this report and a number system has been used that was initiated by original police investigators and was not meant to serialize the sequence of shots.  That number system will continue to be used in this section of this report.

It is clear that a fired bullet entered the exterior sheet metal of the pickup's driver's side door at defect #1 along a slight front to back angle of approximately 80 degrees (where 90 degrees is perpendicular to the left side of the vehicle); that this same bullet exited the interior of the driver's door at defect #6;  that this same bullet and its fragments impacted the interior door panel of the passenger's door at defect #8 causing three major marks and several smaller marks; that a large part of this same fired bullet exited the exterior sheet metal of the passenger's door at defect #7.  After this bullet and its fragments exited the interior of the driver's door panel the grouping

impacted the left sleeve and left forearm underside of Mr. Ivie as he was seated in the drivers seat causing damage to the under side of the left sleeve of his green, thermal shirt, Item #22, and causing injury to the under side of his left forearm at the elbow.

Another fired bullet entered the exterior sheet metal of the pickup's driver's side door at defect #2 and that bullet did not exit the interior surface of the driver's door. The angle of entry for this bullet was demonstrated by police investigators, by virtue of a diagrammed trajectory into the pickup, to be from front to back at an angle of approximately 70 degrees (where 90 degrees is perpendicular to the left side of the vehicle).

Another fired bullet entered the cab of the pickup and impacted the front passenger's seat belt attachment area on the right side vertical pillar, into which the right side door latches, at impact #9. At least portions of this fired bullet perforated the seatbelt fabric, continued on into and through the interior finish plastic cover of the pillar structure and damaged metal beneath the plastic. This fired bullet did not exit the vehicle and there is no exterior sheet metal damage for this bullet impact site. Police investigators show trajectory for this fired bullet by virtue of holding a probe placed into the damaged area and the trajectory defined by this method apparently enters the driver's side door window, passes through the cab in front of both front seats eventually impacting the front passenger's seatbelt structure. Photographs depict small impact defects in the plastic finish cover of the vertical pillar where the seatbelt attach point damage is located and also depict two side by side penetrating defects (bullet impact defect #10) located in the interior sheet metal of the vertical, rear door frame of the passenger's door window in an area that is adjacent to the bullet impact damage to the seatbelt. It is most probable that bullet impact defects #9 and #10 were the result of impact by a fragmented bullet which was most probably fired into the window glass of the driver's side quarter window; not a bullet fired through the driver's door window. Impact with and perforation of the quarter window glass would initiate bullet fragmentation. Small defects in the left side of the driver's seat head rest would be a result of impact by projected broken glass fragments and bullet fragmentation particulate and that type of damage is visible in a scene photograph. This fired bullet and fragments most probably assumed a trajectory that enters the left side quarter window, breaking the window, passing between the back of Mr. Ivie's head and in front of the driver's seat headrest and on into the front passenger's seat belt attach point at damage defect #9 and passenger's door window frame damage defect #10. A least some portion of the passing fired bullet and component bullet fragments most probably impacted the back of Mr. Ivie's head and his upper right back resulting in bleeding wound injuries in his hairline and his upper right back along with the embedding of bullet particulate in his upper right back flesh as verified by medical X-rays. No bullet exits were identified by police investigators for defects #9 and #10.

Another fired bullet entered the exterior sheet metal of the driver's side quarter panel (adjacent and to the rear of the driver's side door) at defect #3. Entry hole characteristics for defect 3# include a raised edge in the defect oriented toward the front of the vehicle and a depressed tab of metal (entry ramp) at the back edge of the defect oriented toward the back of the vehicle. When a fired bullet approaches sheet metal at a shallow angle it will begin to depress the sheet metal on contact and will, with the advance of travel, continue to depress the metal into a groove until the bullet either deflects (ricochets) or it perforates the metal. In the case of defect #3 the metal tab at the end toward the rear of the vehicle is what began as a groove and ended up being an entry ramp. The characteristics of bullet entry defect #3 clearly show this site to be from a bullet entering the sheet metal from back to front, relative to the length of the vehicle, and at a shallow angle, most probably less than 20 degrees from the left side of the vehicle. No bullet exit to the interior of the vehicle or any other surface was identified by police investigators.

Another fired bullet entered the exterior sheet metal of the driver's side quarter panel (adjacent and to the rear of the driver's side door) at defect #4. This defect exhibits the same compelling characteristics as #3 above and they clearly show this site to be from a bullet entering the sheet metal from back to front, relative to the length of the vehicle, and at a shallow angle, most probably less than 20 degrees from the left side of the vehicle. No bullet exit to the interior of the vehicle any other surface was identified by police investigators.

The position of firearm discharge identified above for defects #3 and #4 is an ideal position for direction of fire through the right glass panel of the three panel rear window and out the passenger's door window.

Police investigative documentation identifying bullet trajectories relating to defects #3 and #4 in the left side quarter panel sheet metal of the Dodge Dakota pickup as from front to back at a shallow angle relative to the left side of the pickup are grossly inaccurate and completely contrary to the morphology of those two defects.

The above detail accounts for five fired bullets on the scene; eight ejected cartridge cases collected from the scene were linked to Sgt. Adams' firearm leaving three fired rounds unaccounted for.

The right rear window panel was broken and no bullet trajectories come close to explaining this breakage so this damage is likely the result of an additional firearm discharge.

Information provided by a witness present during test firing of Sgt. Adams' firearm indicates that the rifle ejected fired cartridge cases to the right to a distance of approximately twelve feet from the firearm.

Two groups of eight total expended cartridge casings are depicted in photographs and on the diagram of the scene. One grouping of four casings occupies an area of approximately 8.5 feet by 2 feet on the ground and the other is a linear grouping of four casings occupying an area approximately 4 feet long. The groupings are a little over 7 feet apart at their closest boarder (See Figure #1). This distance between the two groups is much larger than the distance between adjacent casings within each group which indicates that two separate firing locations were established by the shooter. Further the group of 4 casings occupying the larger area of 8.5 by 2 feet indicates that the shooter was moving during discharge of those casings and that the group occupying the smaller area of 4 feet in length indicates that the shooter was nearly stationary in the position for the ejection of all 4 of those casings.

The position of the bullet exit in the passenger's door sheet metal at defect #7, just below the lower edge of the window glass (See Figure #15), indicates that it is most probable that the bullet passing through that defect caused the passenger's door window to fracture through bullet impact to the bottom support rail of the door's window glass located within the door sheet metal at the top edge of the door. Since a relatively small amount of window glass was found inside the passenger's door on the seat and floor, some of the broken window glass fell out on the ground at the scene to the right side of the tire tracks of the pickup. The defect at #7 is related to the defect at #1 in the driver's door so the position of broken glass on the scene from defect #7 fixes a shooting position on the scene for the discharge of the firearm into defect #1; the positon for the shooter on the scene for creating defect #1 is near the left front corner of the parked police vehicle and the cartridge case ejected by that discharge was deposited in the group occupying the larger space (See Figure #19). Three other shots were most probably fired during small movements in and around the left front of the police vehicle including the shot into defect #2 (the driver's side door) and into defects #9 and #10 (the front passengers seat belt attach point on the vertical pillar and front passenger's door's rear, vertical window frame).

The four expended cartridge casings in the smaller area grouping were most probably fired from a position nearly centered in front of the parked police vehicle and a short distance from the first roving shooting position. Shots fired from this position most probably created defects #3 and #4 by two bullets entering into the driver's side quarter panel at a shallow angle relative to the side of the vehicle, from back to front while the pickup truck was in the range of 55 feet past the shooter's position (See Figure #20). Two other shots were fired from this same general position.

The other glass deposit documented on the scene is noted by photographs to be very near the left rear bumper end of the parked police vehicle and this glass deposit is most probably from either the driver's door window on the pickup or from its left side quarter panel window. The large amount of glass on the driver's floor and driver's seat indicates that most of this glass fell into the vehicle therefore little fell outside the vehicle. Glass deposited on the ground near the police vehicle was most probably from the left side quarter window.

No materials have been submitted that show bullets were being fired into the pickup from a front-on position by the shooter, in other words, no bullet impact damage; to the front end of the pickup; to the grille; to the hood; to the engine; to the windshield; to the front tires; etc. It is therefore reasonable to conclude that the shooter was not in the direct line of travel by Mr. Ivie's pickup at the time any of the apparent eight shots were fired.

Bloodstain deposit patterns noted on the interior of the extended cab seating area behind the driver's position indicate a blood flow injury had been sustained in that area and that bloody hair came into contact with surfaces near the broken quarter panel window. Since it is also known that Mr. Ivie owned a dog it is reasonable to conclude that the dog was in the back seating area, was injured by gunfire and escaped out the broken out left side quarter panel window.

## Note:

Other materials and evidence beyond that made available to this laboratory to date obviously exist that could affect opinions expressed in this report. If those materials and/or evidence items are submitted for examination and review then this report will be reviewed, updated and amended as appropriate.

Kay M. Sweeney,                                                                September 26, 2016
Forensic Scientist



TCSO 12-00738-02
MCSO 12-01779

Det. Arnold / 02/14/2012

Scale enlargement showing unequal spacing between marks 2' & 3' and 3' & 4'

0    10



Figure #1 Scene Diagram by Police Investigators Showing Pickup Travel, Parked Police Vehicle, Broken Window Glass and Expended Cartridge Casings

Glass

Headlight

Casings

0  10  20  30  40  50 ft



Figure #2 Photograph by Police of Glass Near Left Rear Bumper of Parked Police Vehicle

10

43

In re Ivie, App. 17



**Figure #3**
**Police Photograph of the Injury
to Mr. Ivie's Upper Right Back**



**Figure #4**
**Police Photograph of
the Injuries to Mr.
Ivie's Left Forearm
and Left Lower Back**

KMS FORENSICS INC                    12                    Laboratory #2k16-010

In re Ivie, App. 18



Apparent bloody hair
swipe type smearing

Apparent volume
blood flow staining

**Figure #5**
Police Photograph of Interior Extended Cab Seating Area; Driver's Side With Apparent Blood Stains That Have Hair Contact Transfer Type Smearing and Volume Flow.



**Figure #6**
**Police Photograph of Vehicle During Processing Showing Bullet Impact Defects Arbitrarily Numbered**

**Figure #7**
**Police Photograph of Vehicle During Processing Showing Bullet Impact Defects Arbitrarily Numbered; View of Passenger's Door Exterior**



**Figure #8**
**Police Photograph of Vehicle During Processing Showing Bullet Impact Defects Arbitrarily Numbered; View of Passenger's Door Interior**



Figure #9
Police Diagram of Mr. Ivie's Pickup with Trajectory Lines Apparently Intended to Define the Trajectories of Bullets Fired Into the Pickup; Lines Can be Numbered from Front to Back at Their Entry Points as #1 Through #5

#4

Into defect #3

0   2   4 ft

Apparently meant to represent trajectory through driver's door window and into defects #9 & #10

#5   Into defect #4

Into defect #1 out #6 into #8 out #7

ICSO 12-00738-02
MCSO 12-01779
Det. Arnold / 02/16/2012
Trajecotry from WA B76920H

#2

#3   #1   Into defect #2



Front of Pickup   Rear of Pickup

Raised lip

Direction of fire; slight angle from front to back of the pickup for #1 and #2

Depressed rim

INCHES   1

INCHES   1

Figure #10
Police Photo of Bullet Defect #1; Driver's Door

Figure #11
Police Photo of Bullet Defect #2; Driver's Door

In re Ivie, App. 21



Front of Pickup  Rear of Pickup

Direction of fire: shallow angle from back to front of the pickup for #3 and #4. Not front to back

Depressed tab

Raised lip

INCHES

**Figure #12**
Police Photo of Bullet Defect #3; Driver's Side Quarter Panel

**Figure #13**
Police Photo of Bullet Defect #4; Driver's Side Quarter Panel

**Figure #14**
Police Photo of Bullet Defect #6; Driver's Side Interior Door Panel; Exit for Bullet into #1 Defect

**Figure #15**
Police Photo of Bullet Defect #7; Passenger's Door Exterior; Exit for Bullet into Defect #8

**Figure #16**
Police Photo of Bullet Defect #8; Interior of Passenger Side Door; Upper Edge of Door Panel Just Below Window; Larger Fragment of This Fired Bullet Ensemble Exited The Exterior Door Sheet Metal at Defect 7, Figure #15 Above

INCHES

In re Ivie, App. 22



**Figure #17**
Police Photo of Bullet Defect #9; Front Passenger's Seatbelt Attach Point

**Figure #18**
Police Photo of Bullet Defect #10; Interior of Vertical Window Frame of Passenger's Door at Rear Edge of Door That is Adjacent to the Door Edge in Figure #17 When This Door is Closed; The Entry Characteristics Visible Indicate an Entry Trajectory of From Back To Front.





**Figure #19**
Police Diagram with Police Diagrammed Pickup on the Tracks Near the Passenger's Door Window Glass Deposit and Shooter in a Position to Fire a Bullet Into Defect #1 in Driver's Door at an Angle Slightly Left of Perpendicular That Exits Defect #7 in Passenger's Door that Most Probably Broke the Passenger's Door Window Glass

Shooter

Firing line overlies trajectory into defect #1 in driver's door

Fired casing ejects 12 feet to the right into larger grouping

**Figure #20**
Police Diagram with Police Diagrammed Pickup on the Tracks Well Past the Parked Police Vehicle and Shooter in a Position to Fire a Bullet Into Defects #3 and #4 in the Driver's Side Quarter Panel and Eject Casings into the Smaller Grouping Position



Fired casing ejects 12 feet to the right into smaller grouping

Most probable firing line for trajectory into defect #3 in driver's side quarter panel (and #4 with small forward movement by the vehicle for #4)

Shooter

In re Ivie, App. 24

Attachment Page 16

RECEIVED

JUL 12 2012

Mason County
Prosecuting Attorney's Off

REC'D & FILED
MASON CO. WA.

2012 JUL 12 P 12: 54

PAT SWARTOS, CO. CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON—DEPUTY
IN AND FOR THE COUNTY OF MASON

STATE OF WASHINGTON,              )
                                  )
                    Plaintiff,    )        NO.   12-1-64-6
                                  )
                                  )
MARTIN IVIE,                      )        CR 7.5 Motion for New Trial
                                  )
                    Defendant,    )

Comes now the defendant pursuant to CR7.5 (a) (2) and moves the Court for a New Trial. This motion is based on the following Affidavit of Counsel and legal argument.

## Affidavit of Counsel

On Monday July 9, 2012 I received a phone call from Juror #4 Margy Stinke, she advised me that the Foreperson of the Jury refused to send out questions to the Judge during deliberations. She advised me that both her and another Juror had serious concerns about the law and wanted to ask the Judge some questions. The Foreperson repeatedly refused to send out any questions to the Court. This left Juror #4 without enough information to reach a proper verdict.

Signed under Penalty of Perjury

James P. Foley WSBA 20402

## Law

Under CR7.5 (a) (2) Misconduct on the part of the Jury is grounds for a New Trial.

ORIGINAL

Jury Veiw 1

THE LAW OFFICE OF
James P. Foley.
1628 Hays Ave. NW

PERMITTOR

STATE OF WASHINGTON
APPLICATION FOR
SPECIALIZED FOREST PRODUCTS HARVESTING PERMIT

County No. 23 - 157163

Application is hereby granted to harvest, *Unlimited* of *Maple, FIR, AlDER CEDAR, Boughs, Salal, Mushrooms* from the following described property, transport, possess.

Amount _____ Unit

PARCEL 42333-51-06017

| Subdivision | Section | Twp. | Rge. |

Local Landmarks *2 miles up Gated Rd. By LAKE CUSHMAN*

County *MAINT. OFFICE*

| Subdivision | Section | Twpt | Rge |

Date this permit *1-4-12*   Permit will expire *12-31-12* or end of calendar year whichever occurs first.

*MARTIN IVIE*   *SAME*

Name of Permittee (Buyer)          Name of Permittor (Seller)

*91 N. EASTSIDE DR*

Street Address                      Street Address

*HOODSPORT   98548   528-7947*

City          Zip      Phone     City          Zip      Phone

It shall be unlawful for any person, upon official inquiry, classification, or other authorized proceedings, to offer as genuine any paper, document, or other instrument in writing purporting to be a harvesting permit, or true copy thereof, or invoice or bill of lading, or to make any representation of authority to conduct harvesting or transporting of specialized forest products, knowing the same to be false, fraudulent, forged, or stolen. I have read and understand the above.

TRUE COPY

RECEIVED
JAN 2012
MASON COUNTY
ASSESSOR

*Signature of Permittee*   Date *1. 4. 2012*

This true copy is given to _____
and shall expire concurrent with the above expiration date or _____
_____ whichever occurs first.

only for   (harvesting)
(harvesting and transportation)       mark out choices
(transportation)                      not selected
(possession other than harvesting or transportation)

Signature of Permittor _____ Date _____

Check here if Permittor's original signature on true copy is required. ☐

COPY

A: 56 B

Exhibit e

A: 56 B

CERTIFICATE OF SERVICE

Pursuant to GR 3.1, I do hereby certify the delivery of the foregoing to the following via US Mail:

STATE OF WASHINGTON ATTORNEY GENERAL
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100

I enacted this delivery on the ___23___ Day of __Feb__, 2019.

NAME: _Martin Ivie_

SIGNATURE: _____

[ Start of Transmittal 2 of 2; 4.24.20 ]

IVIE v. ADAMS, et. al

EXHIBIT F

Lower Court Rulings

(Proof of State Remedy Exhaustion)

FILED
SUPREME COURT
STATE OF WASHINGTON
11/6/2019
BY SUSAN L. CARLSON
CLERK

# THE SUPREME COURT OF WASHINGTON

| | | |
|---|---|---|
| In re the Personal Restraint of | ) | No. 96860-8 |
| | ) | |
| MARTIN STANLEY IVIE, | ) | **O R D E R** |
| | ) | |
| Petitioner. | ) | Court of Appeals |
| | ) | No. 49526-1-II |
| _____ | ) | |

Department II of the Court, composed of Chief Justice Fairhurst and Justices Madsen,

Stephens, González and Yu, considered this matter at its November 5, 2019, Motion Calendar

and unanimously agreed that the following order be entered.

IT IS ORDERED:

That the Petitioner's "Motion For Leave To File Motion to Modify" is granted to the

extent that the Petitioner's pro se motion to modify is accepted for filing as a supplemental

memorandum in support of the motion to modify he filed through counsel.  The Petitioner's

motion to modify the Commissioner's ruling is denied.

DATED at Olympia, Washington, this 6th day of November, 2019.

For the Court

*Fairhurst, C.J.*

CHIEF JUSTICE



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>MARTIN STANLEY IVIE,<br><br>                   Petitioner. | No. 9 6 8 6 0 - 8<br><br>Court of Appeals No. 49526-1-II<br><br>RULING DENYING REVIEW |

      Through counsel, Martin Ivie filed a timely personal restraint petition in Division Two of the Court of Appeals challenging his judgment and sentence on two counts of first degree assault, one count of third degree assault, and one count of attempting to elude a pursuing police vehicle. The court ordered a reference hearing. After receiving the reference hearing findings, a panel of judges denied the petition in an unpublished decision. Through counsel, Mr. Ivie now seeks this court's discretionary review. RAP 16.14(c).[1]

---

[1] In addition to counsel's motion for discretionary review, Mr. Ivie filed a pro se pleading entitled "Grounds for Direct Review and Motion for Emergency Injunction." When the clerk advised Mr. Ivie that the motions could not be accepted for filing when Mr. Ivie was represented by counsel, he indicated that he wished for his filing to be treated as a statement of additional grounds for relief. Through counsel, Mr. Ivie subsequently moved to allow his pleading to serve as a statement of additional grounds. As the clerk noted, a statement of additional grounds applies only in the context of a criminal case on direct appeal. RAP 10.10. Nonetheless, in the interests of justice, the motion to accept the pro se filing is granted in part. I will treat the pleading as a supplemental memorandum in support of counsel's motion for discretionary review and consider the arguments therein.

To obtain this court's review, Mr. Ivie must show that the Court of Appeals decision conflicts with a decision of this court or with a published Court of Appeals decision, or that he is raising a significant constitutional question or an issue of substantial public interest. RAP 13.4(b); RAP 13.5A(a)(1), (b). To obtain postconviction relief generally, Mr. Ivie must show that he was actually and substantially prejudiced by constitutional error or that his trial suffered from a nonconstitutional error that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 347, 325 P.3d 142 (2014).

Mr. Ivie primarily argues that his trial counsel was ineffective in various ways. Defense counsel is strongly presumed to have rendered adequate assistance. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To overcome this presumption, Mr. Ivie must demonstrate that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's unprofessional performance, there is a reasonable probability the outcome of the trial would have been different. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). If Mr. Ivie fails to establish either element of an ineffective assistance claim, the reviewing court need not address the other element. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

To understand Mr. Ivie's claims, a review of the facts and trial evidence is necessary. Deputy William Reed was staking out a location where he suspected someone had been stealing wood. Deputy Reed saw a man arrive in a pickup truck and begin working with the wood. Sergeant Travis Adams then arrived in a marked patrol car, and Deputy Reed recognized the man working with the wood as Mr. Ivie. Deputy Reed ordered Mr. Ivie to get on the ground, but Mr. Ivie got in the truck and drove towards Sergeant Adams. While Deputy Reed pursued on foot, Mr. Ivie quickly turned the truck around and accelerated toward Deputy Reed, who pointed his flashlight

toward the truck. Mr. Ivie did not stop as he approached Deputy Reed on the narrow road, forcing Deputy Reed to jump to avoid the truck. Sergeant Adams then pursued Mr. Ivie in the patrol car with emergency lights flashing. Mr. Ivie soon stopped the truck, put it in reverse, and backed into the front of Sergeant Adams's car. Mr. Ivie then turned up a steep side road. Sergeant Adams followed, and Mr. Ivie again stopped the truck. Mr. Ivie again turned the truck around and accelerated towards Sergeant Adams. Sergeant Adams feared that he might be hit by the truck, moved sideways, and fired at the truck. Mr. Ivie crashed into trees, sustaining gunshot wounds, and was taken to a hospital for treatment. About 16 hours later, two detectives arrived at the hospital to read to Mr. Ivie his rights and interview him. Mr. Ivie provided a recorded statement.

At trial, the State called Cameron Simper, a Thurston County Sheriff's Office detective who also acted as the lead investigator of these crimes, as an expert witness. Detective Simper testified that investigators used a computer program to map the trajectory of the bullets at the scene where Sergeant Adams fired at the truck and introduced into evidence several computer-generated images of the crime scene.

Defense counsel called Fred Doughty as an expert witness, who testified that he had worked in law enforcement for 22 years. Through counsel's questioning, Mr. Doughty testified to how he reconstructed the scene of the shooting. Counsel asked Mr. Doughty for his general observations, and Mr. Doughty testified that he could try to draw a picture of the scene.

Defense counsel also called Marty Hayes as a defense expert. Mr. Hayes said that he had previously testified as an expert in ballistics, crime scene reconstruction, and blood stain pattern analysis. Mr. Hayes opined that the truck was veering away from Sergeant Adams when the shots were fired.

Mr. Ivie testified that he was in pain and heavily medicated at the time he was interviewed at the hospital, and that he was told he had been given morphine and

OxyContin. Mr. Ivie said that his speech was slurred during the interview and his eyes were closed. The detectives described Mr. Ivie as alert. Mr. Ivie also presented witness testimony that he had a dog in the truck at the time of the incident, and that the dog had been wounded in the shooting. Deputy Reed and Sergeant Adams testified that they did not see a dog.

In closing arguments, defense counsel implied that the prosecution was creating false evidence to support its theory of the case. In rebuttal, the prosecution argued multiple times that defense counsel was asking the jury to ignore eyewitness testimony.

In his personal restraint petition, Mr. Ivie argued that the prosecutor's closing arguments were improper and inflammatory, and that defense counsel was ineffective for failing to call an appropriately qualified crime scene or forensic expert to provide an alternative expert opinion that Sergeant Adams was not in the direct line of the vehicle when the shots were fired. Mr. Ivie also argued that counsel should have provided veterinary records and testimony supporting his testimony that his dog was in the truck, and that counsel was ineffective in failing to call the treating physician at the hospital to testify about Mr. Ivie's state of mind and medical condition when interviewed by detectives. Mr. Ivie included a declaration from the doctor that Mr. Ivie had been treated with morphine and was in severe pain. Mr. Ivie also argued that counsel incompetently failed to call the doctor to discuss his gunshot wounds, failed to prepare Mr. Ivie for his testimony, failed to properly object and cross-examine witnesses, failed to contact a lay witness who would have testified that police tried to fabricate evidence, failed to provide a proper closing argument, and failed to object to the State's closing rebuttal argument. The Court of Appeals agreed that the prosecutor's statements were improper and that counsel should have called the treating physician to provide evidence of Mr. Ivie's medication, but it held that Mr. Ivie failed demonstrate prejudice. As to the other claims, the court found no deficient performance by counsel.

In his motion for discretionary review, Mr. Ivie argues that the Court of Appeals applied an improper legal standard to the ineffective assistance of counsel claim by focusing on the sufficiency of the State's evidence rather than on whether there was a reasonable probability that the outcome of the trial would have been different but for counsel's deficient performance. But Mr. Ivie mischaracterizes the Court of Appeals decision. The court carefully explained the rules governing personal restraint petitions and accurately recited and discussed the standards governing ineffective assistance of counsel claims. In finding no prejudice, the court applied these principles and found that, under the circumstances, there was no prejudice. There is no indication that the court applied an improper standard of review, and thus there is no basis for this court's review under RAP 13.4(b).

Mr. Ivie also challenges the Court of Appeals holding that counsel was not deficient in failing to locate and call the lay witness about police fabrication of evidence. This argument was the subject of the reference hearing, and as the Court of Appeals explained, the superior court at the reference hearing found that defense counsel had been aware of the potential witness and had directed an investigator to locate and interview the witness. Given these findings, the Court of Appeals holding that counsel's investigation of the lay witness was not deficient does not conflict with ineffective assistance precedent. The court reasonably found that counsel made a strategic decision to not call a witness he was aware of and whom his investigator could not locate. This issue does not merit review under RAP 13.4(b).

In his supplemental memorandum, Mr. Ivie makes pro se arguments that in part support counsel's arguments but also seek to raise additional legal grounds for relief that were not presented in the personal restraint petition. To the extent Mr. Ivie's supplemental brief addresses the claims raised by counsel in the motion for discretionary review, I have considered these arguments. But as to the new claims, they

may not be raised for the first time in a motion for discretionary review. *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 188 n.5, 94 P.3d 952 (2004).

In sum, Mr. Ivie has not demonstrated a sufficient basis for review under RAP 13.4(b).

The motion for discretionary review is denied.


*Michael E Johnston*
COMMISSIONER

August 6, 2019

Filed
Washington State
Court of Appeals
Division Two

January 23, 2019

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| In the Matter of the Personal Restraint of: | No. 49526-1-II |
| MARTIN STANLEY IVIE, | UNPUBLISHED OPINION |
| Petitioner. |  |

BJORGEN, J. — Martin Stanley Ivie seeks relief from personal restraint imposed following his convictions of two counts of first degree assault, one count of third degree assault, and one count of attempting to elude a pursuing police vehicle.

Ivie argues that the prosecutor improperly impugned defense counsel's role and integrity during rebuttal closing argument. He argues also that defense counsel was ineffective because he failed to (1) consult with a qualified crime scene expert, (2) introduce veterinary records and testimony that would corroborate his testimony, (3) present testimony from his emergency room physician, Thomas J. Ferrer, M.D., to address his physical and mental condition at the time he provided a statement to police at the hospital, (4) present testimony from Dr. Ferrer as to the location of Ivie's gunshot wounds, (5) present testimony from Dr. Ferrer to rebut the impeachment of Ivie's direct testimony with his hospital statement, (6) introduce photographs of his gunshot wounds to challenge the State's version of the shooting, (7) prepare him to testify, (8) present an adequate closing argument including basic exculpatory facts, (9) object to testimony regarding the computer-based crime scene reconstruction, and (10) locate and interview lay witness Aaron Churchill to corroborate his story. Finally, Ivie argues that the cumulative effect of the claimed errors denied him a fair trial.

No. 49526-1-II

On the claim of prosecutorial misconduct, we hold that the challenged comments by the prosecutor were improper, but not flagrant and ill-intentioned or prejudicial. On the claims of ineffective assistance of counsel, we hold that the failure to contact Dr. Ferrer regarding Ivie's physical and mental condition when he provided his hospital statements was deficient, but not prejudicial. We assume that the failure to prepare Ivie for cross-examination was deficient, but hold it did not prejudice him.

We previously remanded the claim that defense counsel failed to locate and interview Churchill to the superior court for a reference hearing to determine necessary issues of fact. On the basis of the superior court's findings of fact on that reference hearing, we hold that defense counsel did not act deficiently with respect to Churchill. On all other claims of ineffective assistance, we hold that the challenged actions of defense counsel were not deficient. Finally, we hold that the cumulative effect of the errors claimed by Ivie did not deprive him of a fair trial.

For these reasons we deny Ivie's personal restraint petition (PRP).

FACTS

The facts underlying Ivie's conviction are set forth in our unpublished opinion from his direct appeal. *See State v. Ivie*, No. 44258-2, slip op at 187 Wn. App. 1008 (Wash. Ct. App. Apr. 21, 2015) (unpublished). We include here only the facts necessary to resolve the issues Ivie raises in this PRP.

I. IVIE'S ENCOUNTER WITH OFFICERS

On a dark, wet, and foggy night, Deputy William Reed was on surveillance at a site from which he suspected someone had been stealing wood. *Ivie*, slip op at 187 Wn. App. 1008, at *2. A pickup truck eventually arrived at the site, and Reed observed an individual exit the truck and

2

No.  49526-1-II

begin working with the wood.  *Id.* at *2-3.  Reed attempted to get a clearer view of the suspect as Sergeant Travis Adams arrived in his marked patrol car.  *Id.* at *3.  Reed recognized the suspect as Ivie and ordered him to get on the ground.  *Id.*  Ivie ignored Reed's orders, got in his truck and drove away in the direction of Adams.  *Id.*

Reed pursued on foot as Ivie quickly turned his truck around and proceeded back the way he had come, accelerating toward Reed.  *Id.*  Reed pointed his flashlight toward Ivie's oncoming truck.  *Id.*  The road was narrow and provided only about two feet of space on either side of Ivie's truck.  *Id.*  Ivie did not stop as he approached Reed.  *Id.*  When the truck came within about five yards, Reed jumped out of the way to avoid it, and Ivie continued down the road.  *Id.*  Adams pursued Ivie in his patrol car with emergency lights flashing.  *Id.*

Soon after, Ivie stopped his truck.  *Id.*  As Adams' patrol car slowed, Ivie put his truck into reverse and backed into the front of Adams' car.  *Id.*  Ivie then turned and proceeded up a steep side road.  *Id.*  Adams followed Ivie up the side road until he observed Ivie come to a landing.  *Id.*  Ivie stopped the truck on the landing, and Adams stopped about 20 feet behind him. *Id.*

Adams got out of his car with his assault rifle and began backing down the roadway to a point about 30 feet behind his car, coming to stand at the foot of an embankment.  *Id.* at *4. Adams issued orders to Ivie, who remained in his truck.  *Id.*  Ignoring the orders, Ivie turned his truck around and accelerated directly at Adams.  *Id.*  Adams was afraid he may have been "squished or killed," so he moved out of the way sideways along the embankment.  *Ivie*, at *5. As Adams moved sideways along the embankment, he fired four shots at Ivie's truck and, as Ivie

3

No. 49526-1-II

continued down the road, he fired four additional shots. *Id*. Ivie crashed into trees at the bottom of the embankment. *Id*.

Ivie sustained multiple gunshot wounds and was taken to a hospital emergency room for treatment. *Id*. Roughly 16 hours later, two detectives arrived at the hospital to read to Ivie his *Miranda*[1] rights and to interview him. *Id*. Ivie provided a recorded statement. *Id*.

## II. PROCEDURAL HISTORY

The State charged Ivie with (1) two counts of first degree assault, based on the incidents in which he drove his truck toward Reed and, later, Adams, (2) two counts of second degree assault based on the same conduct, (3) one count of third degree assault, based on the incident in which he backed his truck up into Adams' patrol car, (4) one count of attempting to elude a pursuing police vehicle, and (5) one count of second degree theft, based on Ivie's activities at the felled maple tree on or about February 9. *Id*. at *6. The jury returned guilty verdicts on all counts as charged. *Id*. The trial court entered convictions on all the verdicts, except those for the alternative second degree assault charges, which the court vacated. *Id*. Ivie appealed. *Id*. at *7. In his direct appeal, we reversed Ivie's conviction of second degree theft, but we affirmed all of his remaining convictions. *Id*. at *1-2.

Ivie subsequently filed the present PRP. We remanded the matter to superior court for a reference hearing to determine certain issues of fact relating to Ivie's claim that defense counsel failed to locate and interview Churchill, a potential witness. The superior court held the reference hearing and issued findings of fact on the referred issues.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

No. 49526-1-II

## III.  ADDITIONAL FACTS

A.   Defense Counsel's Closing Argument

Defense counsel, James P. Foley, made closing remarks, in pertinent part, as follows:

> You know, there's a saying in the law, or an expression we use in the law that says a philosopher is a blind man at midnight in a cellar looking for a black cat that isn't there.  He's distinguished from the theologian in that the theologian finds the cat.  He is further distinguished from the prosecutor who smuggles the black cat into the cellar under his coat and emerges to try and produce it.  That is what is going on here, ladies and gentlemen of the jury.
>
> Martin Ivie was shot.  And whether it was excessive or not is not your issue.  Martin Ivie was shot.  And now the State wants you to believe oh, he was shot because he was assaulting officers.  Not stealing wood, he was assaulting officers.  That is a black cat in a cellar at midnight that isn't there.
>
> You go back and you read all of the jury instructions carefully, and you look at all the evidence, and you weigh all the testimony you've heard, and return verdicts of not guilty on all of the assault counts and the eluding.

Verbatim Report of Proceedings (VRP) at 773-74.

B.   Prosecutor's Closing Rebuttal Argument

The State made closing rebuttal argument, in pertinent part, as follows:

> Apparently *Mr. Foley* [defense counsel] *wants you to ignore the testimony* of, for instance, Fred Doughty and Martin Hayes – and I'll come right back to it in a moment and talk about it.  He wants you to focus only, and solely, and entirely, on the testimony of Martin Ivie, the defendant in this very serious case.

VRP at 775 (emphasis added).

> But *Mr. Foley wants you to forget* about everything else that you heard evidence of, and he wants to continue to talk about the shooting, but then rightfully tell you that that isn't what this case is about.

VRP at 775 (emphasis added).

> Again, thank goodness for headlights.  *Mr. Foley would have you believe that these rogue cops* dressed in black in the dark of night were just in the road and nobody could see them.  As he's driving straight at Deputy Reed, right in the middle of the headlights with Deputy Reed's flashlight shining back at the car, Deputy Reed shouts into his radio, he's coming right at me; has to jump out of the way so

No. 49526-1-II

as not to get hit. And it's a second or two later that Sergeant Adams goes by and can see when he goes by, and Deputy Reed is not in the roadway in the headlights.

VRP at 780 (emphasis added).

> *Mr. Foley says* that the angles of the shots that Sergeant Adams fired don't add up. Apparently *he's really asking you to again ignore the testimony* of all of the witnesses, including Mr. Hayes, who evaluated the vehicle, and evaluated all the measurements that the Thurston County Sheriff's Office produced.

VRP at 781 (emphasis added).

C.    Testimony of Adams

A major point of contention in this matter involves Adams' testimony about his position in relation to Ivie when he fired the shots. In *Ivie*, we stated:

> As Adams moved sideways along the embankment, he held his assault rifle up as high up as he could, attempting to get the barrel on the same level as Ivie, and fired four rounds. The truck straightened out and went off the embankment. As the truck passed him, Adams fired four additional rounds into the driver's side door area. The truck proceeded down the embankment, crossing the road behind Adams's car and crashing into trees and bushes at the bottom of the embankment on the other side of the road.

*Ivie*, slip op at 187 Wn. App. 1008, at *3.

However, Adams' exact position is somewhat ambiguous. Adams testified that he would have been hit "dead center" and "squished or killed" if he had not moved out of the way. VRP at 315. Adams said that as he was moving laterally out of the way of Ivie's truck along the embankment:

> I took my rifle and held it up high, so that I could try to get it up to the driver's height. And I fired at the driver in the vehicle at that point to try and get him to stop – stop driving and run me over. . . . But I was down on the bank below the level of the vehicle and the truck was up above me. So I wanted to get my rifle up in the air as high as I could, hoping to get the rounds into the truck.

VRP at 316. Adams also testified:

6

No. 49526-1-II

> At the time that I . . . fired the first four rounds . . . I was surprised that I didn't get
> hit. I was surprised that I was able to move across the bank fast enough to not get
> hit by the front of the truck. I didn't bother firing any rounds at that point because
> I would have hit nothing but grille.

VRP at 320. He further stated:

> I was still very concerned that that truck was going to go sideways and come off
> the bank and hit me. With those first four rounds I was just trying to get the driver
> to stop that behavior so that I didn't get squished by the truck.
>  . . . .
> At that point the vehicle straightened -- seemed to straighten out and it came off the
> bank right where I had been standing a second before. I turned at that point and
> shined my light again on the truck. And what I could see was the driver was down
> hanging on the steering wheel and had turned and was looking down the road,
> basically in the direction from which we had just come up.

VRP at 318. "My concern at that point was if this truck gets behind me and starts heading back

down this road from where we came from . . . that there was going to be a collision . . . so I fired

again at the vehicle." VRP at 319.

From the time Adams started to move laterally to the point where he fired the second

volley of shots, Ivie's truck was continuously accelerating in a forward direction. Adams'

testimony suggests that he fired four rounds at the driver's side of the truck as it was moving

toward him and then an additional four rounds at the driver's side as it was moving past and

away from him.

D.      Testimony of Detective Cameron Simper

The State called Cameron Simper, a detective for the Thurston County Sheriff's Office,

as an expert witness. Simper was assigned as the lead investigator in Ivie's case. The State

introduced several computer-generated images of the crime scene through the testimony of

Simper.

7

No. 49526-1-II

Simper testified that investigators used a program called "Total Station," which is "computer software that generates an image . . . [a] two-dimensional, three-dimensional image to represent what was . . . located at the scene." VRP at 221. He testified, "Due to the . . . total station we can map . . . the trajectory . . . of bullets." *Id*. He testified investigators used the software to map "the progression of Ivie's pickup truck based on the tire tracks that were located at the scene." *Id*. at 223. He testified investigators "[a]lso used the total station equipment to mark the expended casings from Sergeant Adams' patrol rifle, and also the resting point of Ivie's vehicle, as well as other items of evidentiary value that were collected at the scene." *Id*.

E.    Testimony of Fred Doughty

Fred Doughty was the first expert witness that Foley called in Ivie's defense. Doughty testified that he worked in "law enforcement for about 22 years" prior to his current position as a "private investigator." VRP at 358. Doughty did not testify as to whether he was a forensics expert.

Foley asked Doughty if he could make some "general observations . . . about trajectories, and where bullets might have come from, and that sort of thing?" VRP at 375. Doughty responded, "Yes, sir." *Id*. Foley then stated,

> Okay. And if you could, we're going to test out your artistic skills. Having seen this – been to the scene, could you draw us a picture of where the – on the landing the travel trailer was, and the police car, and the path of Mr. Ivie's car based on all of your observations and expertise?

*Id*. To which, Doughty responded, "I can try." *Id*. Doughty then drew a picture of the incident, including trajectories and vehicle orientation, in response to Foley's questions.

Ivie claimed that his dog was with him at the time of the incident. Doughty testified that he had reviewed the veterinary records, which confirmed that Ivie's dog had sustained a gunshot

No. 49526-1-II

wound.  Reed and Adams testified that they did not see or hear a dog during the events of that

night.  However, Adams testified also that "as I was moving down [towards Ivie's truck that

crashed], it sounded like something scurried off into the brush, or moved into the brush line."

VRP at 351.  He did not "know what it was." *Id.*

F.    Testimony of Marty Hayes

        Marty Hayes was the second expert witness Foley called in Ivie's defense.  Foley

questioned Hayes about his qualifications as follows:

> [Foley]:     And in your several dozen times testifying in court you've been qualified
>              as an expert in, like I said before, the use of force, yes?
>
> [Hayes]:     Yes.
>
> [Foley]:     Ballistics?
>
> [Hayes]:     Yes.
>
> [Foley]:     Crime scene reconstruction?
>
> [Hayes]:     Yes.
>
> [Foley]:     Blood stain pattern analysis?
>
> [Hayes]:     Yes.

VRP at 458.

> Hayes provided his expert opinion as to the path of Ivie's vehicle, in part, as follows:
>
> That opinion would be that he was – the vehicle itself was veering away from
> Sergeant Adams' vehicle, and of course where Sergeant Adams said he was.  And
> I base that on the – the picture that I saw, the trajectory of the rounds, the – the
> tracks in the grass and in the – the mud that were – were provided to me, and frankly
> Sergeant Adams['] own statement that he gave to investigating officers where he
> said that it wasn't coming at him any longer when he fired the shots.

VRP at 461-62.

9

No. 49526-1-II

G.      Testimony of Barbara Marx

Barbara Marx and Ivie lived together.  Marx testified that she was with Ivie prior to the incident.  She further testified that Ivie had his dog with him when he left that night.  Marx claims that, on the day following the incident, she found Ivie's dog who was "bloody, and . . . [his] neck was all swollen."  VRP at 485.  Marx testified she took the dog to the veterinarian.  Marx opined that Ivie's dog had been shot.

H.      Testimony of Ivie

Ivie testified as to the location of his gunshot wounds as follows:  "I was hit – grazed here, on top of my head, and two in my back."  VRP at 592.

Ivie argues that he was in pain and heavily medicated at the time he was interviewed by detectives at the hospital.  He testified that "I was told that I was on morphine and also OxyContin."  VRP at 552.  Ivie's eyes were closed throughout the interview and his speech was somewhat slurred during the first portion of it.  *Ivie*, slip op at 187 Wn. App. 1008, at *3.  The detectives, however, described Ivie as alert.  *Id.*  Ivie also testified that he had his dog with him at the time of the incident.

ANALYSIS

I. PRP LEGAL PRINCIPLES

To be entitled to collateral relief through a PRP, the petitioner must first prove error by a preponderance of the evidence.  *In re Pers. Restraint of Crow*, 187 Wn. App. 414, 420-21, 349 P.3d 902 (2015).  Second, if the petitioner is able to show error, he or she then must also prove prejudice, the degree of which depends on the type of error shown.  *Id*. at 421.

No. 49526-1-II

If a constitutional error, the petitioner must demonstrate it resulted in actual and substantial prejudice to him. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 409, 114 P.3d 607 (2005). "Actual and substantial prejudice, which 'must be determined in light of the totality of circumstances,' exists if the error 'so infected petitioner's entire trial that the resulting conviction violates due process.'" *Crow*, 187 Wn. App. at 421 (quoting *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985)). If a nonconstitutional error, the petitioner must meet a stricter standard and demonstrate the error resulted in a fundamental defect, which inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Schreiber*, 189 Wn. App. 110, 113, 357 P.3d 668 (2015); *Woods*, 154 Wn.2d at 409. If the petitioner fails to make a prima facie showing of either actual and substantial prejudice or a fundamental defect, we deny the PRP. *Schreiber*, 189 Wn. App. at 113.

The PRP must be supported with facts or evidence and may not merely rely on conclusory allegations. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). If allegations are based on evidence external to the existing record, the petitioner must show that he has competent, admissible evidence to establish the facts that entitle him to relief. *Id.*

> "If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits . . . must contain matters to which the affiants may competently testify."

*Id.* at 488-89 (quoting *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992)). "The petitioner must show that the 'factual allegations are based on more than speculation, conjecture, or inadmissible hearsay.'" *Id.* at 489 (quoting *Rice*, 118 Wn.2d at 886).

11

No. 49526-1-II

## II. PROSECUTORIAL MISCONDUCT

Ivie argues that the prosecutor committed flagrant and ill-intentioned misconduct by disparaging the role and integrity of defense counsel. We agree that the prosecutor's comments were improper, but we disagree that they were flagrant and ill-intentioned or prejudicial.

A.    Legal Principles

To establish prosecutorial misconduct, the defendant must prove that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

We analyze prejudice in misconduct claims under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, the defendant need only show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Id.* If, however, the defendant did not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Id.* at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). Because Ivie did not object to the claimed misconduct by the prosecutor, we apply the latter two-part test.

12

No. 49526-1-II

B.     Improper Remarks in Prosecutor's Rebuttal Closing Argument

Ivie claims four instances when the prosecutor allegedly "impugned the role and integrity

of defense counsel" in his rebuttal closing argument. Br. of Pet'r at 40. The prosecutor stated, in

pertinent part, as follows:

> Apparently *Mr. Foley wants you to ignore the testimony* of, for instance,
> Fred Doughty and Martin Hayes.
>
> . . . .
>
> But *Mr. Foley wants you to forget* about everything else that you heard
> evidence of.
>
> . . . .
>
> Again, thank goodness for headlights. *Mr. Foley would have you believe
> that these rogue cops* dressed in black in the dark of night were just in the road and
> nobody could see them.
>
> . . . .
>
> *Mr. Foley says* that the angles of the shots that Sergeant Adams fired don't
> add up. Apparently *he's really asking you to again ignore the testimony* of all of
> the witnesses.

VRP at 775, 780-81 (emphasis added.)

Ivie points to *Warren* to support his argument that the prosecutor's statements were

improper. 165 Wn.2d at 29. In *Warren*, the court concluded that "it was improper for the

prosecutor to tell the jury there were a 'number of mischaracterizations' in defense counsel's

argument as 'an example of what people go through in a criminal justice system when they deal

with defense attorneys.'" *Id.* Additionally, the prosecutor "described defense counsel's

argument as a 'classic example of taking these facts and completely twisting them to their own

benefit, and hoping that you are not smart enough to figure out what in fact they are doing.'" *Id.*

13

No. 49526-1-II

Although the court concluded these statements were improper, the statements were not so flagrant and ill-intentioned that a curative instruction could not have obviated the prejudice. *Id.* at 29-30.

Ivie also cites *State v. Negrete*, 72 Wn. App. 62, 66, 863 P.2d 137 (1993), in which during closing argument defense counsel cast an undercover police officer as a "trained liar" and a confidential informant as a snitch paid to "frame people." *Id.* at 66. In rebuttal, the prosecutor stated:

> I have listened with great interest to the comments of [defense counsel]. Two things come to mind: I have never heard so much speculation in my entire life in going into facts that weren't even presented into evidence. And the second is, *he is being paid to twist the words of the witnesses by Mr. Negrete.*

*Id.* at 66. The court concluded the statement was improper, but held that there was no prejudice because Negrete did not establish a substantial likelihood that the remark affected the jury's verdict. *Id.* at 67-68.

The prosecutor's statements here and in *Warren* rest on a common core: the accusation, either express or plainly implied, that defense counsel did not fairly present the evidence in an attempt to mislead the jury. In each case, the prosecutor's message was that defense counsel wanted the jury to ignore facts and violate their oath. This message crosses the line from legitimate, aggressive argument into unsupported personal attacks on defense counsel's motivation and purpose. We follow the Supreme Court's decision in *Warren* and hold that the prosecutor's comments here impugned the role of defense counsel.

The State also maintains that the prosecutor's statements were proper because they were invited or provoked by defense counsel's closing argument. The State claims that counsel's extended metaphor contained accusations that the prosecution had deceived the jury. The State

No. 49526-1-II

argues that the defense counsel's accusations permitted the prosecutor to respond in kind. However, whether or not this is an accurate characterization of the defense's argument, an improper argument by one party does not license a rebuttal that itself descends to the improper. The State's attempted justification is not persuasive.

On balance, we conclude the prosecutor's statements were improper because they impugned the role and integrity of defense counsel and were not justified by defense counsel's closing argument.

C.   Prejudice: Heightened Standard

As noted, Ivie will be deemed to have waived his prosecutorial misconduct claim unless he shows that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. *See Emery*, 174 Wn.2d at 761. Ivie makes neither showing.

To meet the first of these prongs, Ivie must show that the challenged remark "'is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *See Thorgerson*, 172 Wn.2d at 443 (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 757 (1994)). The impropriety in the prosecutor's remarks was the message that defense counsel wanted the jury to ignore facts and violate their oath. A reasonable curative instruction would have informed the jury that the prosecutor's remarks were improper and directed them not to consider those remarks, thus likely removing prejudice and placing the prosecutor in a less than flattering light. Ivie thus does not make the first showing.

No. 49526-1-II

The second showing in the heightened standard is that of "a substantial likelihood that the misconduct affected the jury verdict." *Emery*, 174 Wn.2d at 760. "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *Warren*, 165 Wn.2d at 28.

Although the prosecutor's comments were improper, in the context of the total argument they were not prejudicial. In *Negrete*, the court concluded the defendant could not show prejudice even when the prosecutor openly claimed defense counsel was "being paid to twist the words of the witnesses" by the defendant. 72 Wn. App. at 66 (emphasis omitted). The remarks by the prosecutor here essentially reminded the jury to weigh evidence that defense counsel had not mentioned, although in a way that improperly attributed a motive to defense counsel. Their effect is much less potent than the remarks in *Negrete*. Given the weight of the evidence against Ivie and the nature and context of the prosecutor's remarks, we do not see a substantial likelihood that those remarks affected the verdict.

Ivie has not shown that either prong of the heightened standard from *Emery* is met. Therefore, his claim of prosecutorial misconduct fails.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Ivie argues that defense counsel was ineffective for several reasons. We analyze each claim in turn.

### A.   Legal Principles

A claim of ineffective assistance of counsel "presents a mixed question of fact and law reviewed de novo." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To demonstrate ineffective assistance of counsel, Ivie must satisfy the two-pronged test laid out in

16

No. 49526-1-II

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 674 (1984).  If Ivie fails

to establish either prong of the test, we need not inquire further.  *State v. Foster*, 140 Wn. App.

266, 273, 166 P.3d 726 (2007).

First, Ivie must show that counsel's performance fell below an objective standard of

reasonableness.  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  To

demonstrate deficient performance, the record must show no legitimate strategic or tactical

rationale for the trial attorney's decisions.  *McFarland*, 127 Wn.2d at 335-36.  Second, Ivie must

show prejudice.  *Id.* at 335.  Prejudice exists if there is a reasonable probability that, but for

counsel's errors, the result of the proceeding would have differed.  *State v. Grier*, 171 Wn.2d 17,

34, 246 P.3d 1260 (2011).  In the context of a PRP, a petitioner who shows prejudice under this

standard effectively meets his burden in showing actual and substantial prejudice on collateral

attack.  *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 848, 280 P.3d 1102 (2012).

Still, we must be "highly deferential" in evaluating a challenged attorney's performance.

*Strickland*, 466 U.S. at 689.  We strongly presume that the appellant received effective

representation.  *State v. Brett*, 126 Wn.2d 136, 198, 892 P.2d 29 (1995).

B.      Failure to Call Crime Scene or Forensic Expert Witnesses

Ivie argues that his defense counsel's failure to consult with a qualified crime scene or

forensics expert was deficient and prejudiced his right to a fair trial.  We disagree.

On the matter of deficiency, he claims that had a qualified crime scene or forensics expert

presented testimony, he or she would have rebutted the State's evidence and corroborated his

testimony that he was not driving directly toward Adams when Adams fired the shots.  Ivie

supports his claim with an expert's declaration and post-conviction lab report.  Additional expert

17

No. 49526-1-II

testimony, Ivie argues, would have controverted the State's theory as to the path of the vehicles, trajectory of the bullets, and his resulting gunshot wounds.

However, the evidence at trial indicated that Ivie began accelerating directly at Adams. *Ivie*, slip op at 187 Wn. App. 1008 at *4. Adams then moved out of the way sideways along the embankment and fired four initial shots at Ivie's truck and, as Ivie continued down the road, four additional shots. *Id*. at *5. The expert report only provides an opinion that Adams "was not in the direct line of travel by Mr. Ivie's truck at the time any of the eight shots were fired." Br. of Pet'r, Decl. of Kay Sweeny, App. 1-6, at 4. Thus, the report is not dispositive of whether Ivie ever drove directly at Adams, the critical element of the assault charge.

"Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004); *see also State v. Mannering*, 150 Wn.2d 277, 287, 75 P.3d 961 (2003) (failure to call defense expert witness was strategic). Defense counsel called private investigator Doughty to provide expert opinion testimony. Doughty provided testimony regarding, among other matters, the path of the vehicles and trajectory of the bullets. Defense counsel had Doughty draw a picture in court that illustrated his opinion as to vehicle orientation and bullet trajectory. Counsel's questioning revealed that the testimony of Doughty was part of counsel's strategy to counter the State's forensic evidence.

Defense counsel also called firearms expert Hayes who testified that he had experience in the use of force, ballistics, accident reconstruction, and blood stain pattern analysis. The examination likewise countered the State's evidence as to vehicle orientation and bullet trajectory. Hayes testified that "the vehicle itself was veering away from Sergeant Adams'

18

No. 49526-1-II

vehicle, and of course where Sergeant Adams said he was." VRP at 461-62. The decision to

rely on the testimony of Doughty and Hayes on these points was a legitimate strategic choice.

Ivie therefore has not shown that defense counsel was deficient for calling these

individuals, instead of others. Because Ivie has not established deficient performance, this claim

fails.

C.     Failure to Introduce Veterinary Records and Testimony

Ivie argues that his defense counsel's failure to introduce veterinary records and

testimony was deficient and prejudiced his right to a fair trial. Ivie supports his claim with a

copy of the veterinary records and the declarations of two veterinarians who reviewed the

records. He claims this failure to introduce was deficient because the records and testimony

would have weakened Reed's credibility and strengthened his credibility. We disagree.

"Generally the decision whether to call a particular witness is a matter for differences of

opinion and therefore presumed to be a matter of legitimate trial tactics." *Davis*, 152 Wn.2d at

742. Reed and Adams testified that they did not see or hear a dog during the events of that night.

Testimony from Ivie and Marx showed that Ivie had his dog with him at the time of the incident

and that the dog may have been shot. At trial, Doughty testified that he reviewed the veterinary

records, which verified the dog had suffered a gunshot wound.

However, evidence that the dog was shot during the incident would not contradict the

officers' testimony that they did not see or hear a dog during the events. Thus, veterinary

records or testimony showing the dog was shot would have had no effect on Reed's credibility

and would, at best, only add cumulative weight to Ivie's story. Defense counsel was not

deficient in not offering the veterinary evidence.

19

No. 49526-1-II

D.    Failure to Contact or Call Dr. Ferrer at Ivie's CrR 3.5 Hearing

Dr. Ferrer cared for Ivie while he was at the hospital following the shooting.  Ivie avers

that defense counsel's failure to contact Dr. Ferrer or call him to testify at the CrR 3.5 hearing

regarding Ivie's physical and mental condition when the police interrogated him was deficient.

Further, he argues this failure "prejudiced his ability to challenge the admissibility of his hospital

statement and prejudiced him at trial." Br. of Pet'r at 20.  We agree that defense counsel's

failure to contact Dr. Ferrer was deficient, but we disagree that it was prejudicial.

1. PRP Threshold

The State claims that this issue was already raised and decided on direct review in *Ivie*.

In the context of a PRP, "'[a] defendant may not recast the same issue as an ineffective

assistance claim; simply recasting an argument in that manner does not create a new ground for

relief or constitute good cause for reconsidering the previous rejected claim.'" *Davis*, 152

Wn.2d at 671 (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)).

On direct appeal, Ivie claimed that "the admission of the statements he made in the

hospital violated his right to due process because he made them involuntarily." *Ivie*, slip op at

187 Wn. App. 1008, at *6.  In response, we noted that "Ivie presented no expert medical

testimony concerning his condition at the time or the effects of any drugs he had taken." *Id.* at

*7.  We held, however, that the evidence presented was sufficient to support the conclusion that

Ivie made the hospital statements voluntarily. *Id.* at *13.

In his PRP, Ivie claims that defense counsel "never interviewed . . . [his] doctor as to the

nature of his injury or his condition at the time of his hospital interrogation." Br. of Pet'r at 22.

To support his claim, Ivie provides a declaration from Dr. Ferrer describing Ivie's injuries,

20

No. 49526-1-II

stating that Ivie reported severe pain, and describing the morphine doses that Ivie received. Ivie
also provides a supplemental declaration from Dr. Ferrer that states defense counsel never
contacted him.

While we did conclude that Ivie's hospital statements were properly admitted, we did not
make a judgement as to whether counsel was ineffective for failing to investigate and obtain
testimony from Dr. Ferrer. Therefore, Ivie's present claim differs from the one raised on direct
review and, as such, we consider his ineffective assistance of counsel claim.

2. Failure to Contact Dr. Ferrer was Deficient

Ivie claims that testimony from Dr. Ferrer "would have corroborated and elaborated . . .
that he was in pain and heavily medicated at the time he was interrogated." Reply Br. of Pet'r at
7; *see also* Br. of Pet'r at 23. He believes Dr. Ferrer's testimony would have supplied evidence
that he did not provide a knowing and voluntary waiver of his right to silence. *Id.*

Dr. Ferrer's declaration provides a detailed medical description of Ivie's gunshot wounds.
The declaration also states that Ivie reported severe pain and had been administered morphine.
The medical reports attached to Dr. Ferrer's declaration show that Ivie was given morphine
intravenously five times on February 10, 2010 and that Percocet was ordered but not
administered. Further, Dr. Ferrer states that "it is frequently difficult to obtain information from
a patient who is experiencing extreme pain and receiving morphine." Br. of Pet'r at 53. Finally,
Dr. Ferrer stated that if subpoenaed, he would have testified consistently with his declaration and
the medical records. This evidence would have been relevant to the nature of Ivie's surgery, the
severity of his wounds, and the effect of extreme pain and morphine.

In Ivie's direct appeal, we outlined the trial court's oral findings as follows:

21

No. 49526-1-II

> (1) [P]olice obtained permission from hospital staff before questioning Ivie, (2) Ivie was well enough to walk at the time, (3) Ivie generally gave coherent, responsive answers to their questions, without significant pauses, (4) when police asked open ended questions, Ivie gave detailed answers and added his own thoughts, (5) Ivie admitted that he had memories of the interrogation independently of the recording, and (6) no evidence showed that police sought to coerce Ivie or overbear his will. The court also noted that Ivie presented no evidence of the exact nature, timing, or duration of the surgery or of the severity of his wounds, other than his own testimony that he had been repeatedly shot, suffered a concussion, and was under the influence of morphine and OxyContin.

*Ivie*, slip op at 187 Wn. App. 1008, at *7. However, we only made this decision, in part, because "Ivie presented no expert medical testimony concerning his condition at the time or the effects of any drugs he had taken." *Id*. at *7.

"Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *Davis*, 152 Wn.2d at 742. However, this does not relieve an attorney of the

> duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691.

Dr. Ferrer declared that defense counsel did not contact him. Dr. Ferrer was Ivie's treating physician immediately after the shooting and was the primary source of information regarding Ivie's medical condition before he provided a recorded statement. Defense counsel should have contacted Dr. Ferrer, at least, to rule out whether Ivie was capable of providing a knowing and voluntary waiver. *See State v. Ray*, 116 Wn.2d 531, 548, 806 P.2d 1220 (1991) ("Failure to investigate or interview witnesses, or to properly inform the court of the substance of

No. 49526-1-II

their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest.").

Because counsel did not reasonably investigate whether Dr. Ferrer had information pertaining to Ivie's physical and mental condition after the shooting, it was impossible for counsel to have made an informed decision as to whether Dr. Ferrer should testify at the CrR 3.5 hearing. Accordingly, defense counsel was deficient.

3. Failure to Contact Dr. Ferrer was Not Prejudicial

Dr. Ferrer's declaration does not contradict the trial court's oral findings. While Dr. Ferrer declared that it is "frequently difficult" to obtain information from a patient experiencing pain and under the influence of morphine, he did not claim to have any personal knowledge of Ivie's interrogation or the circumstances in which he provided information in response to questioning. Thus, Dr. Ferrer's declaration does not show that it was difficult for Ivie to provide information in his circumstances.

Further, consistently with the trial court's findings, Dr. Ferrer did not declare that Ivie would have been incapable of providing coherent answers to police questioning. Although Dr. Ferrer would have been able to provide testimony of the exact nature, timing, and duration of the surgery and of the severity of Ivie's wounds, his testimony, as reflected in his declaration, would not have undermined the trial court's findings regarding the circumstances and manner in which Ivie responded to police questioning. For this reason, Ivie fails to demonstrate that the failure to contact or call Dr. Ferrer to testify prejudiced Ivie. Because Ivie has not demonstrated prejudice, his claim of ineffective assistance fails.

No. 49526-1-II

E.      Failure to Call Dr. Ferrer at Trial Regarding Hospital Statement

Related to the previous issue, Ivie argues that defense counsel's failure to obtain Dr.

Ferrer's testimony was deficient and prejudiced him at trial because his credibility had been

attacked through impeachment and Dr. Ferrer would have served to rehabilitate his credibility.[2]

We agree that defense counsel's failure to contact Dr. Ferrer was deficient, but we disagree that

it was prejudicial.

Ivie argues that because defense counsel failed to investigate or call Dr. Ferrer, he lost an

opportunity to explain why there were inconsistencies between his direct testimony and his

hospital statement. Ivie claims that counsel was deficient because the jury would have found Dr.

Ferrer more believable at trial. Ivie contends that his hospital statement was unreliable because

of the trauma he recently experienced and the medications he was administered. He contends

that Dr. Ferrer's testimony would have explained to the jury why his hospital statement was

unreliable, thereby rehabilitating his credibility. In addressing these contentions, we focus on

whether counsel provided ineffective assistance in not contacting Dr. Ferrer or investigating his

potential testimony.

1. Failure to Investigate Dr. Ferrer's Potential Testimony was Deficient

As noted, the decision whether to call a particular witness is presumed to be a matter of

legitimate trial tactics. *Davis*, 152 Wn.2d at 742. However, this does not relieve an attorney of

the

> duty to make reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary. In any ineffectiveness case, a particular

---

[2] Ivie argues that "[i]t appears that he was impeached no less than 13 times with statements he
made at that hospital that differed from his trial direct examination." Br. of Pet'r at 25.

No. 49526-1-II

> decision not to investigate must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691.

Dr. Ferrer declared that defense counsel did not contact him. Dr. Ferrer was Ivie's

treating physician immediately after the shooting and was the primary source of information

regarding Ivie's medical condition before he provided a recorded statement. Ivie was

interviewed soon after sustaining serious gunshot wounds for which he had been given

morphine. Defense counsel should have contacted Dr. Ferrer, at least to determine whether Ivie

was capable of providing a knowing and voluntary waiver. *See Ray*, 116 Wn.2d at 548 ("Failure

to investigate or interview witnesses, or to properly inform the court of the substance of their

testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may

rest."). If defense counsel had done so, he would have been able to make an informed decision

as to whether to call Dr. Ferrer at trial to neutralize the impeachment using Ivie's hospital

statements. Accordingly, defense counsel was deficient.

2. Failure to Investigate Dr. Ferrer's Potential Testimony was Not Prejudicial

Ivie, however, does not show a reasonable probability that, but for counsel's failure to

call Dr. Ferrer, the verdict would have been different. Ivie testified he was shot in the back.

VRP at 592. He also testified that he was in pain and on morphine and OxyContin. VRP at 552.

Dr. Ferrer's generalization that it is difficult to obtain information from a patient experiencing

extreme pain and receiving morphine by itself has little application to Ivie's specific

circumstances. Although defense counsel performed deficiently by neglecting to contact Dr.

Ferrer to investigate whether Ivie was capable of providing a knowing and voluntary waiver, Dr.

25

No. 49526-1-II

Ferrer's declaration does not present any facts, beyond the noted generalizations, that call the knowing and voluntary nature of Ivie's waiver into question in the circumstances presented.

This evidence does not show a reasonable probability that the verdict would have differed had Dr. Ferrer's potential testimony been investigated. Thus, Ivie does not demonstrate that he was prejudiced.

Accordingly, this claim of ineffective assistance fails.

F.    Failure to Call Dr. Ferrer Regarding Location of Ivie's Gunshot Wounds

Ivie argues that his counsel's failure to obtain Dr. Ferrer's testimony was deficient and prejudiced him at trial because Dr. Ferrer would have provided evidence as to the location of his gunshot wounds. This, in Ivie's view, would challenge the State's version of the shooting. We disagree.

Ivie contends that because he was shot in the back, the jury could reasonably infer that Adams "was not . . . standing directly in front of the truck . . . but standing on the driver's side of the truck and fired after the truck had passed." Br. of Pet'r at 25. Adams testified that he would have been hit "dead center" and "squished or killed" if he did not take evasive actions. VRP at 315. He also testified, "I was surprised I didn't get hit. I was surprised that I was able to move across the bank fast enough to not get hit by the front of the truck. I didn't bother firing any rounds at that point because I would have hit nothing but grille." VRP at 320. Adams testified that he fired four rounds in the side of the truck and then an additional four rounds as the truck was moving past and away from him.

Dr. Ferrer was not at the scene, so he could not testify as to whether Ivie accelerated towards Adams. Similarly, he could not testify as to whether Adams took evasive actions to

26

No. 49526-1-II

avoid being struck.  More to the point, any testimony by Dr. Ferrer that Ivie was shot in the back

would be consistent with Adams' testimony that he fired the four final shots as Ivie was going

past and away from him.

Therefore, defense counsel was not deficient in failing to call Dr. Ferrer to testify to the

location of the wounds.  Accordingly, this claim of ineffective assistance fails.

G.    Failure to Introduce Photographs of Ivie's Gunshot Wounds

Ivie argues that his counsel's failure to introduce photographs of his gunshot wounds was

deficient and prejudiced him at trial.  We disagree.

Ivie claims that introducing the photographs would have corroborated his story and

discredited Adams' testimony.  However, as discussed above, Adams testified that he fired his

weapon from the side and rear of Ivie's truck.  The State's testimony is relatively consistent with

the location of Ivie's gunshot wounds, which presents a strategic reason for not introducing the

photographs.  Moreover, the photographs do not address the issue of whether Adams was in the

path of Ivie's vehicle before he fired the shots.  Hence, counsel was not deficient for not

introducing photographs.

Therefore, this claim fails.

H.    Failure to Prepare Ivie to Testify

Ivie claims that defense counsel's failure to prepare him to testify was deficient and

prejudiced him at trial.  Assuming, without deciding, that counsel was deficient, we hold that

Ivie does not show prejudice; that is, a reasonable probability that the verdict would have been

different if he had been better prepared to respond to inconsistencies between his hospital

statement and his trial testimony.

No. 49526-1-II

Ivie claims that "counsel never showed him a transcript or played him the recording of the statement he made" while he was at the hospital. Br. of Pet'r at 28. He supports this with his own declaration. Ivie argues that, as a result, "he was unprepared to respond to questions about discrepancies between his trial testimony and his hospital statement." Br. of Pet'r at 28. However, before Ivie testified, his hospital statement was the subject of a motion to exclude. At this hearing, an audio recording of his statement was played in court, and Ivie acknowledged that he listened to the recording.

Ivie's argument presupposes that he would have been better prepared to answer the prosecutor's questions on cross-examination if counsel had showed him a transcript or played him the recording of his hospital statements before he testified at trial. However, regardless of whether Ivie's trial testimony could have been clearer about his prior inconsistent statements, or whether his demeanor or credibility could have been improved with added preparation, Ivie does not claim that the substance of the testimony he provided under oath at trial would have been any different.

The purpose of Ivie's testimony, in part, was to undermine the reliability of his hospital statement by explaining that he was heavily medicated post-surgery thereby rendering him unable to provide coherent, credible information to the police investigators. Ivie provided positive testimony on those points when the prosecutor impeached him with prior inconsistent statements on cross-examination. He also provided contradictory testimony on cross-examination refuting parts of his hospital statement.

When asked about the discrepancy between his hospital statement and trial testimony regarding when he noticed that the police were tailing him with their lights on, Ivie clarified that

28

No. 49526-1-II

he testified inconsistently because he "was under the influence of morphine and OxyContin" at the hospital. VRP at 614. Even if counsel had prepared him better, the substance of Ivie's answer would still be the same—his hospital statements were unreliable because he was heavily medicated. That testimony supplied a reasonable explanation for any inconsistency in his memories of whether the lights were on. Hence, we see no prejudice in the allegedly deficient preparation.

When the prosecutor asked Ivie about when he noticed he was being chased by the police, when he saw the police vehicle lights, and why he failed to stop, he confirmed he made certain statements at the hospital, but stated, at trial, "that's not what I meant" and provided an alternative explanation. VRP at 625-29. Even with better preparation by counsel, the essence of Ivie's answer would in all probability remain the same: explaining that the prosecutor had misinterpreted his hospital statement and describing what was going through his mind at the time. Hence, the failure to prepare him did not result in prejudice.

The prosecutor impeached Ivie about his relationship with a neighbor and his awareness about her presence at the trailer where he attempted to turn his vehicle around. At the hospital, Ivie stated his neighbor lived there only during the summer. However, at trial, Ivie testified that "Cynthia comes up throughout the year" and "comes up once in awhile [sic] during the winter." VRP at 634-35. He said, "I was in hopes that there would be" someone at the trailer when he turned in that direction. VRP at 634. He clarified, "She just doesn't live up there. She – lives somewhere else – during the winter. There's a lot of people that come up once in awhile [sic]." VRP at 634-35.

No. 49526-1-II

Again, even if counsel had more thoroughly prepared Ivy, the substance of his answer would likely be the same: he did not know whether Cynthia was currently residing at the trailer, but hoped so. Also, there was no obvious inconsistency between Ivie's statement at the hospital that Cynthia lives there only during the summer and his trial testimony that she comes up throughout the year. We see no prejudice to Ivie from these statements.

The prosecutor impeached Ivie in his testimony about Adams' vehicle and his location. Ivie's hospital statement referred to the vehicle as a car. Ivie stated that when he came around, Adams had blocked the road again, and he was out of the vehicle. He also stated that he noticed the red and blue lights on the vehicle. At trial, however, Ivie testified he did not necessarily know if it was a car or truck, could not see Adams out of the vehicle, and did not notice any red and blue lights engaged on the vehicle at the time. As above, even if counsel had prepared him better, the substance of Ivie's answer, if truthful, would likely have been the same. More to the point, these minor inconsistencies were readily explained by Ivie's testimony about his condition at the hospital. We see no prejudice to Ivie from these statements.

The prosecutor impeached Ivie about his understanding of who owned the property where the maple tree was. At the hospital, Ivie stated, "[I]t's in the greenbelt; belongs to everybody in Cushman." 4 VRP at 642. At trial, Ivie testified that the property belonged to a man named John Spurrier. Ivie also explained at trial, however, that "[t]here's a greenbelt right next to John's property. And where the tree is, I believe it's on the greenbelt." 4 VRP at 642. Ivie does not explain how his answer would have differed if he had been better prepared. Also, his testimony about his condition at the hospital provided his best explanation for this minor discrepancy. We see no prejudice from these statements.

30

No. 49526-1-II

Ivie's post-trial declaration does not claim that he would have made different substantive statements at trial if he had been better prepared. Thus, additional pretrial preparation producing more comprehensive answers would likely have added little to the essence of his testimony. Ivie chose to testify at trial. His trial testimony would either be consistent or inconsistent with his hospital statement. Presuming Ivie's trial testimony was truthful, no amount of preparation would have changed Ivie's trial testimony to avoid inconsistency with his purportedly inaccurate hospital statement. Further, no amount of preparation would have precluded the State from impeaching Ivie with his prior inconsistent statements. Ivie has not shown a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. Accordingly, Ivie was not prejudiced by counsel's alleged failure to prepare him.

I.      Failure to Object to State's Evidence and to Adequately Cross-Examine Witnesses

Ivie argues that his counsel's failure to object to Simper's testimony regarding the computer-based crime scene reconstruction was deficient and prejudiced him at trial. We disagree.

Ivie claims that defense counsel should have objected to Simper's testimony because the prosecutor did not lay a proper foundation for the testimony. In addition, Ivie argues that on cross-examination, "counsel asked no questions challenging the images, the measurements, or the accuracy of the bullet trajectories contained on the images." Br. of Pet'r at 30. Ivie argues that "[t]he Total Station diagrams and the State's demonstrative photographs with the colored rods were inaccurate and misleading as to the trajectory of the shots fired by Adams." Reply Br. of Pet'r at 12.

31

No. 49526-1-II

The State introduced several computer-generated images (i.e., Total Station diagrams) of the crime scene through the testimony of Simper. The images allegedly depicted the location of various items of evidence such as shell casings, Adams' vehicle, the path of Ivie's truck, and the trajectory of the bullets fired by Adams.

When the basis of an ineffective assistance argument is the failure to object to evidence, the appellant must show "(1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct; (2) that an objection to the evidence would likely have been sustained; and (3) that the result of the trial would have been different had the evidence not been admitted." *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998) (internal citations omitted). Ivie argues that the failure to object could not be a legitimate strategy or tactic because the evidence does not support his expert's theory regarding vehicle orientation and bullet trajectory.

However, defense counsel may have decided that an objection would draw attention to evidence that was inconsistent with his defense. In *State v. Gladden*, 116 Wn. App. 561, 568, 66 P.3d 1095 (2003), the court concluded that the failure to object was a legitimate trial tactic where counsel may have decided that an objection would draw attention to the information he sought to exclude. By not objecting to Simper's testimony, jurors were less likely to place undue weight on that evidence. Counsel may also have decided that Simper's testimony actually helped Ivie, because the bullet holes in the side of the car were inconsistent with the claim that Ivie drove straight at Adams. Ivie has not rebutted the presumption that the failure to object was the product of legitimate trial tactics or strategy.

Ivie also argues that "[d]uring cross-examination of Detective Simper, counsel asked no questions challenging the images, the measurements, or the accuracy of the bullet trajectories

32

No. 49526-1-II

contained on the images." Br. of Pet'r at 30.  However, on cross-examination, when counsel

asked whether Simper could form an opinion about where Adams was standing when he fired at

Ivie's vehicle, Simper testified,

> [T]hat would be narrowed down to a specific area, just based on the position where those shell casings were located.  However, to determine exactly where Sergeant Adams was at the time that each shot was fired would be . . . futile, just based on . . . several variables.

VRP at 251.

Thus, counsel's question was able to convey to the jury that determining Adams' exact

location would be an exercise in futility and, as such, questioned the accuracy of the total station

software.  *Id.*  Notwithstanding the fact that Ivie now claims he would have asked different (or

more) questions on cross-examination, shrewd arguments often look obvious in hindsight.  As

the court stated in *Strickland*, 466 U.S. at 669,

> a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

We presume counsel was reasonable in his line of questioning because the manner of

cross-examination is generally a matter of judgment and strategy.  *See Davis*, 152 Wn.2d at 720.

Ivie has not shown the contrary.  Therefore, he has not established deficient performance, and his

claim fails.

J.      Failure to Contact Lay Witnesses (Churchill)

Ivie claims that defense counsel's failure to locate and interview lay witnesses to

corroborate his testimony was deficient and prejudiced his defense.  Specifically, Ivie claims that

33

No.  49526-1-II

if counsel had performed an objectively reasonable investigation of lay witnesses he would have

contacted Churchill, who claims Reed attempted to fabricate evidence against Ivie.  We disagree.

To provide effective assistance, defense counsel must investigate the case, which

includes investigation of witnesses.  *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015).

The duty to investigate does not necessarily require that every witness be interviewed, but

defense counsel has an obligation to provide factual support for the defense where it is available.

*Davis*, 152 Wn.2d at 739.  "Failure to investigate or interview witnesses, or to properly inform

the court of the substance of their testimony, is a recognized basis upon which a claim of

ineffective assistance of counsel may rest."  *Ray*, 116 Wn.2d at 548.  Therefore, failure to

interview a particular witness may constitute deficient performance.  *Jones*, 183 Wn.2d at 340.

Whether performance is deficient may hinge on the reason for such failure to interview.  *Id.*

Further, "[i]n evaluating prejudice, 'ineffective assistance claims based on a duty to investigate

must be considered in light of the strength of the government's case.'"  *Davis*, 152 Wn.2d at 739

(quoting *Rios v. Rocha*, 299 F.3d 796, 808-09 (Ninth Circ. 2002)).

Because the merits of Ivie's contentions could not be determined solely on the record

before us, we remanded the petition for a reference hearing on this specific issue.  At the

reference hearing, Foley, Churchill, Doughty, and Reed testified.  After the hearing, the superior

court reviewed defense counsel's file and his billings that referenced Churchill.  The superior

court also accepted a stipulation of the parties that Marx, Ivie's girlfriend, was contacted by

Doughty regarding Churchill.

In sum, the superior court found the following relevant facts:  (1) Ivie advised defense

counsel that Churchill was a potential witness, (2) defense counsel had knowledge that Churchill

34

No. 49526-1-II

was a potential witness and knowledge concerning the substance of his testimony, (3) defense counsel directed Doughty, his private investigator, to locate and/or contact Churchill, (4) Doughty attempted to locate and/or contact Churchill by phone and on-line searches, (5) the online search disclosed two possible addresses for Churchill, one in Shelton and one in Union, (6) Doughty investigated one possible address, where he contacted a woman who claimed she did not know where Churchill was, but the superior court's order does not discuss whether Doughty contacted the other address, (7) it is more probable than not that the attempts to find Churchill were limited to those testified to by Doughty, (8) defense counsel testified that he never contacted Churchill because he could not find him, (9) Churchill testified that Reed attempted to suborn false testimony from him for use in Ivie's trial, and (10) Reed testified that he has never asked a potential witness to testify falsely, including Churchill.

The record does not support Ivie's assertion that his counsel's performance fell below an objective standard of reasonableness. Instead, the record shows that defense counsel attempted to investigate Churchill's allegations, but his private investigator, Doughty, was unable to locate or contact him. *Cf. In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 355, 325 P.3d 142 (2014) (after defendant suggested defense counsel contact potential lay witness, counsel made numerous attempts to interview the lay witness, and even tried to subpoena her, but to no avail). Defense counsel's attempts to locate and/or contact Churchill through his private investigator were objectively reasonable. The inability to locate and/or contact a potential witness—after reasonable efforts have been made—does not constitute deficient performance. *See id.* at 355-56.

No. 49526-1-II

Furthermore, the facts suggest that defense counsel was generally aware of the facts and testimony Churchill would have provided to support Ivie's credibility argument against Reed. Counsel's choice not to develop this argument following the inability to locate and/or contact Churchill was similarly objectively reasonable. *See id.* at 355-56. Therefore, we do not address the prejudice prong of the *Strickland* test, and Ivie's claim fails.

K.    Failure to Present Adequate Closing Argument

Ivie claims that his counsel's failure to present an adequate closing argument including basic exculpatory facts was deficient and prejudiced him at trial. Specifically, Ivie claims that counsel's failure to address the location of his gunshot wounds and his physical and mental condition at the time he provided his hospital statement in closing was objectively unreasonable. We disagree.

There are many different ways to present a closing argument. Decisions about what to include (or exclude) in closing argument necessarily involves trial strategy and tactics. *Grier*, 171 Wn.2d at 33-34. During closing argument, defense counsel emphasized Ivie's testimony that it was dark outside, the officers were wearing black, he did not see Reed or Adams, and he did not intend to hit either of them with his vehicle. This was consistent with a legitimate defense strategy to bolster his client's testimony. Counsel may have had a strategic reason for not emphasizing the location of the gunshot wounds and his hospital statement. For example, the hospital statement had already been used to impeach Ivie's direct testimony, which counsel was trying to highlight in closing. Given the strong presumption that counsel's performance was effective, we hold that his closing argument was not deficient.

36

No. 49526-1-II

L.    Failure to Object to the State's Rebuttal Closing Argument

Ivie claims that defense counsel's failure to object to the prosecutor's rebuttal closing

argument described in Part II., B. of the Analysis was deficient and prejudiced him at trial.

In Part II. B. and C., above, we concluded that the prosecutor's rebuttal closing was

improper, but that it was not prosecutorial misconduct because it failed the heightened standard

of *Emery*. It failed that standard, we concluded, for two separate reasons: a curative instruction

would have obviated any prejudicial effect on the jury and the improper remarks did not have a

substantial likelihood of affecting the jury verdict. The latter is the same standard for showing

the prejudice necessary for ineffective assistance of counsel. Therefore, even if we assume that

counsel's failure to object to the prosecutor's improper remarks was deficient, Ivie still has not

shown the requisite prejudice for ineffective assistance of counsel. With that, this claim of

ineffective assistance of counsel fails.

## IV. CUMULATIVE ERROR

Finally, Ivie argues that the cumulative effect of the errors he has identified deprived him

of a fair trial. We disagree.

Under the cumulative error doctrine, a reviewing court may reverse a defendant's

conviction when the combined effect of trial errors denied him a fair trial, even if each error

alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Stated

another way,

> [f]or relief based on the cumulative error doctrine, the defendant must show that
> while multiple trial errors, 'standing alone, might not be of sufficient gravity to
> constitute grounds for a new trial, the combined effect of the accumulation of errors
> most certainly requires a new trial.'"

37

No.  49526-1-II

*State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017) (quoting *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984)).  The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome.  *Weber*, 159 Wn.2d at 279.

The case law offers some guidance as to how these abstractions are to be implemented. In *State v. Badda*, 63 Wn.2d 176, 183, 385 P.2d 859 (1963), the Supreme Court held that an accumulation of errors required a new trial.  The errors included the failure to give the required precautionary instruction when one of two co-defendants confessed to the crime; the failure to give the required precautionary instruction when the case was submitted to the jury solely on uncorroborated accomplice testimony; and the failure to inform the jury that the verdict must be unanimous in the absence of adequate evidence the jury was polled.  *State v. Alexander*, 64 Wn. App. 147, 158, 822 P.2d 1250 (1992), held that reversal was required because (1) a witness impermissibly suggested the victim's story was consistent and truthful, (2) the prosecutor impermissibly elicited the defendant's identity from the victim's mother, and (3) the prosecutor repeatedly attempted to introduce inadmissible testimony during the trial and in closing.  Finally, *State v. Whalon*, 1 Wn. App. 785, 804, 464 P.2d 730 (1970), reversed a conviction on the basis of (1) the court's severe rebuke of the defendant's attorney in the presence of the jury, (2) the court's denial of the testimony of the defendant's wife, and (3) the jury listening to a tape recording of a lineup in the absence of court and counsel.

In this decision we hold or assume that a number of Ivie's challenges show improper or deficient conduct, but that they fail for lack of prejudice.  We summarize their effects below and examine whether their combined effect denied Ivie a fair trial.

No. 49526-1-II

First, we hold above that the failure to contact Dr. Ferrer or investigate his potential testimony about Ivie's condition at the hospital was deficient in two respects: it may have provided evidence that Ivie's waiver of the right to silence was not voluntary, and it may have better explained the inconsistencies between Ivie's hospital statement and his trial testimony. We recognize that Dr. Ferrer's testimony as reflected in his declaration would have helped Ivie to some degree in arguing an involuntary waiver or in repairing his credibility. Dr. Ferrer, though, did not testify about Ivie's condition individually. Rather, he opined that "it is frequently difficult to obtain information from a patient who is experiencing extreme pain and receiving morphine." Br. of Pet'r, App. 51-53, Decl. of Ferrer. Any benefit to Ivie from this opinion is limited by its generality. In addition, the description in Dr. Ferrer's declaration of Ivie's wounds, his reporting severe pain and his taking morphine was largely cumulative of Ivie's testimony.

Next is Ivie's claim that defense counsel did not inform him of the content of Ivie's statements at the hospital, which in turn impaired Ivie's ability to withstand cross-examination based on those statements. Part III. H., above, describes the specific instances in which Ivie was impeached with the hospital statements and Ivie's explanations of the inconsistencies. It also notes that Ivie's post-trial declaration does not claim that he would have made different substantive statements at trial if he had been better prepared.

Finally, we hold above that the impugning remarks in the State's rebuttal closing argument were improper, and we also assume that defense counsel's failure to object to them was deficient. The effect these actions may have had would lie in the jury's attitude toward defense counsel.

39

No. 49526-1-II

The State presented substantial evidence against Ivie. The impropriety and deficiencies just described, viewed individually, did not prejudice Ivie. Considering the nature and context of these actions, the substantial evidence against Ivie, and having reviewed the record, we cannot say that their combined effect deprived Ivie of a fair trial. This conclusion is supported by a comparison to the more serious errors that underlay the cumulative error in *Badda, Alexander, and Whalon*, noted above.

For these reasons, cumulative error does not warrant granting this petition.

CONCLUSION

Ivie's PRP is denied.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.

We concur:

Worswick, J.

Maxa, C.J.

<u>EXHIBIT C</u>

Roster of Defendants, Including Addresses
&
Concise Itemization of Roles

1. Travis Adams - Shooter
322 N. 3rd Street, Shelton, WA  98584

2. Detective Arnold - Total Station® Ballistics Analyst
2000 Lakeridge Dr. SW, Olympia, WA  98502

3. J. Bjorgen - anti-Constitutional Usurpation of Court
950 Broadway, Ste. 300, Tacoma, WA  98402-4454

4. Sgt. Brady - Misprision & Accomplicement
2000 Lakeridge Dr. SW, Olympia, WA  98502

5. Dusty Breen - "Critical Incident Investigation Team" ("CIIT") Cover-Up
345 West Main Street, Chehalis, WA 98352

6. Peter Camiel - Corrupted Cover-Up Lawyer
520 Pike St., Suite 2500, Seattle, WA 98101-4036

7. Sgt. Clark - Cover-Up Team
2000 Lakeridge Dr. SW, Olympia, WA  98502

8. Michael Dorcy - Prosecuting Attorney / Perjurer & Forger
521 N. 4th St. #A, Shelton, WA  98584

9. Investigator Doughty - Investigator / Cover-Up
521 N. 4th St. #A, Shelton, WA  98584

10. Lt. Elwin - Head of Cover Up Team
2000 Lakeridge Drive SW, Olympia, WA  98502

11.  Amber Finley - Usurper of The Bench
419 N. 4th St., Floor 2, Shelton, WA  98584-0078

12.  James Foley - Corroborating Attorney
402 Capitol Way S, Ste. 3, Olympia, WA  98501-1096

13. Det. J. Gardner - Cover-Up "Investigation" Team Member
322 N. 3rd Street, Shelton, WA  98584

14. Det. Gray - CIIT Cover-Up
2000 Lakeridge Dr. SW, Olympia, WA  98502

15. Marty Hayes - Defense's False Ballistics "Expert" for Cover-Up Testimony
402 Capital Way S, Ste. 3, Olympia, WA  98501-1096

16.  Michael Johnston – Usurper of Court & Misprisioner for Cover-Up
415 12th Ave. SW, Olympia, WA  98504-0929

17. Charles Lane – Corroborating State Attorney
1800 Cooper Point Road SW, Ste. 3, Olympia, WA  98502-1179

18. Capt. Eric Mainio – Evidence Suppressor
191 Constantine Way, Aberdeen, WA 98520

19. C.J. Maxa – Usurper of Court
950 Broadway, Ste. 300, Tacoma, WA  98402-4454

20. Det. McGowan – CIIT Cover-Up Crew
100 W. Broadway, Ste. 3, Montesano, WA  98563

21.  William Reed – Ambush Accomplice
322 N. 3rd Street, Shelton, WA 98584

22.  Det. J. Rhoades – Cover Up "Expert"
322 N. 3rd Street, Shelton, WA  98584

23. Casey Salisbury – Head of CIIT Cover-Up
322 N. 3rd Street, Shelton, WA  98584

24.  Dep. M. Sargent – Misprisioner
322 N. 3rd Street, Shelton, WA  98584

25.  Det. Cameron Simper – Lead CIIT 'Officer-Involved Shooting' Cover Up
Specialist
2000 Lakeridge Drive SW, Olympia, WA  98502

26. John Snaza – Chief of Cover Up Team
2000 Lakeridge Dr. SW, Olympia, WA  98502

27. Bill Tuffrees – Evidence Suppressor
191 Constantine Way, Aberdeen, WA  98520

28. Jon Tunheim – Public Records Cover Up
2000 Lakeridge Dr. SW, Olympia, WA  98502

29.  Timothy Whitehead – Leader of Corrupt Prosecution & Evidence Withholding
& Evidence Destruction
521 N. 4th St., #A, Shelton, WA  98584

30. Sgt. Wilkinson – Evidence Suppression / Mail Fraud
191 Constantine Way, Aberdeen, WA  98520

31. J. Worswick – Usurper of Court
950 Broadway Ste. 300, Tacoma, WA  98402-4454